LEAGUE OF WOMEN VOTERS MINNESOTA; Common Cause, a District of Columbia nonprofit corporation; Jewish Community Action; Gabriel Herbers; Shannon Doty; Gretchen Nickence; John Harper Ritten; Kathryn Ibur, Petitioners,

v.

Mark RITCHIE, in his capacity as Secretary of State of the State of Minnesota, and not in his individual capacity, Respondent.

No. A12–0920.

Supreme Court of Minnesota.

Aug. 27, 2012.

William Z. Pentelovitch, Richard G. Wilson, Justin H. Perl, Wayne S. Moskowitz, Alain M. Baudry, Catherine Ahlin–Halverson, Maslon Edelman Borman & Brand, LLP, Minneapolis, MN; Teresa Nelson, American Civil Liberties Union of Minnesota, Saint Paul, MN; and Laughlin McDonald (pro hac vice), American Civil Liberties Union Foundation, Inc., Atlanta, GA, for petitioners.

Mark Ritchie, Secretary of State, Saint Paul, MN, for respondent.

Robert R. Weinstine, Thomas H. Boyd, Kristopher D. Lee, Winthrop & Weinstine, P.A., Minneapolis, MN, for intervenors-respondents.

Timothy P. Griffin, Liz Kramer, Leonard, Street and Deinard Professional Association, Minneapolis, MN; and Daniel B. Kohrman, AARP Foundation Litigation, Michael Schuster, AARP, Washington, D.C., for amicus curiae AARP.

Sara R. Grewing, City Attorney, Gerald T. Hendrickson, Deputy City Attorney, Saint Paul, MN, for amicus curiae City of Saint Paul.

Mark A. Jacobson, Paul A. Banker, Kelly G. Laudon, Carrie Ryan Gallia, Lindquist & Vennum P.L.L.P., Minneapolis, MN, for amicus curiae Citizens for Election Integrity—Minnesota.

Michael O. Freeman, Hennepin County Attorney, David C. Brown, Senior Assistant County Attorney, Minneapolis, MN, for amicus curiae Hennepin County Attorney's Office.

Nathan J. Marcusen, Bowman and Brooke LLP, Minneapolis, MN; Zachary S. Kester (pro hac vice), Kaylan L. Phillips (pro hac vice), Noel H. Johnson (pro hac vice), ActRight Legal Foundation, Washington, D.C.; and J. Christian Adams (pro hac vice), Election Law Center, PLLC, Alexandria, VA, for amicus curiae Minnesota Majority.

Erick G. Kaardal, William F. Mohrman, Mohrman & Kaardal, P.A., Minneapolis, MN, for amici curiae State Senator Scott J. Newman and State Representative Mary Kiffmeyer.

OPINION

PER CURIAM.

This action was brought under Minn. Stat. § 204B.44 (2010), seeking to correct an alleged error in the preparation of the ballot for the general election. Specifically, petitioners seek to prevent the people of Minnesota from voting on the question of whether photographic identification should be required to vote in Minnesota. The court is unanimous in concluding that petitioners are not entitled to this unprecedented relief.[1] We express no opinion in this case as to the merits of changing Minnesota law to require photographic identification to vote; that question, as petitioners concede, is not presented in this case. Because we conclude that the petitioners have not met their burden of demonstrating that there is an error that requires the judiciary to intercede, we deny the petition.

In April 2012, the Legislature approved a proposed amendment to Article VII, Section 1 of the Minnesota Constitution. This section currently provides:

Every person 18 years of age or more who has been a citizen of the United States for three months and who has resided in the precinct for 30 days next preceding an election shall be entitled to vote in that precinct. The place of voting by one otherwise qualified who has changed his residence within 30 days preceding the election shall be prescribed by law. The following persons shall not be entitled or permitted to vote at any election in this state: A person not meeting the above requirements; a person who has been convicted of treason or felony, unless restored to civil rights; a person under guardianship, or a person who is insane or not mentally competent.

Minn. Const. art. VII, § 1. The proposed amendment would designate the provision above as (a) and add two subsections, (b) and (c), as follows:

(b) All voters voting in person must present valid government-issued photographic identification before receiving a ballot. The state must issue photographic identification at no charge to an eligible voter who does not have a form of identification meeting the requirements of this section. A voter unable to present government-issued photographic identification must be permitted to submit a provisional ballot. A provisional ballot must only be counted if the voter certifies the provisional ballot in the manner provided by law.

(c) All voters, including those not voting in person, must be subject to substantially equivalent identity and eligibility verification prior to a ballot being cast or counted.

Ch. 167, § 1, 2012 Minn. Laws 145, 145–46.

In the same session law, the Legislature also approved the language of the question to be placed on the November 2012 general election ballot concerning the proposed constitutional amendment:

Shall the Minnesota Constitution be amended to require all voters to present valid photo identification to vote and to require the state to provide free identifi-

---

1. Where we part company with the dissenters is over the remedy and the scope of our review. Going well beyond the limited nature of the question presented here, the dissenters engage in fact-finding and go on at length about the alleged negative impact the change, if approved, may have on voting in Minneso-

ta. Because the merits of the constitutional amendment are not before us, we take no opportunity to comment further on the dissents' factual conclusions and negative commentary on the merits and impact of the proposed constitutional amendment.

cation to eligible voters, effective July 1, 2013?

*Id.* § 2(a), 2012 Minn. Laws at 146. Finally, the Legislature approved a title for the ballot question: "Photo Identification Required for Voting." *Id.* § 2(b), 2012 Minn. Laws at 146.

In order to become effective, the amendment must be agreed to by "a majority of all the electors voting at the election," not just a majority of those voting on the amendment itself. Minn. Const. art. IX, § 1. The legislation at issue in this case provides that, if approved, the constitutional amendment would become "effective July 1, 2013, for all voting at elections scheduled to be conducted November 5, 2013, and thereafter." Ch. 167, § 2(a), 2012 Minn. Laws at 146.

On May 30, 2012, petitioners filed a petition with our court under Minn.Stat. § 204B.44, seeking to "strik[e] the ballot question pertaining to the Voter Identification and Provisional Ballot Amendment" and to enjoin the Secretary of State from placing the question on the November 2012 general election ballot. Petitioners allege that the Legislature's ballot question "is misleading because it does not accurately and factually describe the proposed amendment, and because it fails to describe at all certain important substantive provisions contained in the amendment."

We issued a scheduling order that set deadlines for briefs, requests to intervene, and requests for amicus participation. *League of Women Voters Minn. v. Ritchie,* A12–0920, Order (Minn. filed June 1, 2012). The named respondent, Secretary of State Mark Ritchie, declined to file a brief on the merits, but submitted an affidavit of Gary Poser, Director of Elections for the State of Minnesota, that explained the dates by which a decision was needed to timely prepare ballots for the general election.

## I.

We received motions to intervene from State Senator Scott J. Newman and State Representative Mary Kiffmeyer, Minnesota Majority, Inc., the 87th Minnesota House of Representatives, and the 87th Minnesota Senate. We granted intervention to the House and the Senate, but denied the motions of Minnesota Majority and the individual legislators. *League of Women Voters Minn. v. Ritchie,* A12–0920, Order at 2–3 (Minn. filed June 15, 2012). We issued our order on the intervention motions with opinion to follow, and now set forth the basis for that order. *Id.* at 4.

All three motions to intervene sought intervention as of right under Minn. R. Civ. P. 24.01:

> Upon timely application anyone shall be permitted to intervene in an action when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Rule 24.01 establishes four requirements for intervention as of right: (1) a timely application; (2) an interest in the subject of the action; (3) an inability to protect that interest unless the applicant is a party to the action; and (4) the applicant's interest is not adequately represented by existing parties. *Minneapolis Star & Tribune Co. v. Schumacher,* 392 N.W.2d 197, 207 (Minn.1986). All those seeking intervention contended that they satisfied each of the requirements. Alternatively, the proposed intervenors sought permissive inter-

vention under Minn. R. Civ. P. 24.02, which requires only that the proposed intervenors have "a common question of law or fact" with the action.

■ With respect to the House and the Senate, petitioners do not object to the permissive intervention of these bodies. Given that the named respondent, Secretary of State Mark Ritchie, did not participate in a substantive way in these proceedings, we agreed with petitioners that it is appropriate for the House and Senate, the bodies that passed the legislation at issue in this case, to participate, and so without deciding whether those bodies may intervene as of right, we granted their motion for permissive intervention.

With respect to the motion from Senator Newman and Representative Kiffmeyer, that motion sought intervention conditioned on the failure of the Legislature to do so. Given that the House and the Senate successfully intervened, we denied the motion to intervene by Senator Newman and Representative Kiffmeyer.

■ Finally, with respect to Minnesota Majority, it described itself as "a nonprofit corporation that promotes social welfare" and "an advocate for election integrity in Minnesota." Noting that it has been "actively involved in successfully placing this Voter Identification Amendment on the ballot," Minnesota Majority contended that it would "suffer substantially if the people of Minnesota [were] not permitted to vote

to enhance the integrity of the Minnesota election process."

As petitioners point out, as a nonprofit corporation Minnesota Majority does not vote. Nor does Minnesota Majority assert that its members are eligible to vote in Minnesota and that it is representing the interests of its members. Rather, the only basis on which Minnesota Majority asserts standing to intervene is the fact that it expended resources to get the proposed constitutional amendment passed in the Legislature. But courts have denied intervention to entities whose only interest in legislation is that they lobbied for its passage. *See Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 344–45 (6th Cir.2007) (denying intervention to "a public interest group involved in the process leading to the adoption of [a] challenged statute" and noting that the group "is not itself regulated by any of the statutory provisions at issue here"); *Keith v. Daley*, 764 F.2d 1265, 1269 (7th Cir. 1985) (affirming denial of intervention by an interest group in litigation brought by physicians challenging an Illinois statute regulating abortion because the group's interest as "chief lobbyist" in support of the bill was not "a direct and substantial interest sufficient to support intervention"); *United States v. 36.96 Acres of Land*, 754 F.2d 855, 857 (7th Cir.1985) (affirming denial of intervention by the Save the Dunes Council, a nonprofit corporation described as having "lobbied extensively for national legislation protecting the dunes and expanding the protected areas").[2]

---

2. Minnesota Majority cites three cases that it contends support a determination that its interests are sufficient to support intervention. But insofar as these cases permit intervention, they are distinguishable. For example, in *Alaskans for a Common Language, Inc. v. Kritz*, 3 P.3d 906 (Alaska 2000), intervention was granted to a group because it represented two of the individuals designated under state law as sponsors of the ballot initiative. *Id.* at

912–13. Similarly, in *Sportsmen for I–143 v. Montana Fifteenth Judicial District Court*, 308 Mont. 189, 40 P.3d 400 (2002), the proposed intervenors were two groups of Montana citizens described in the opinion as "sponsors," who under Montana law were responsible for obtaining sufficient signatures to get the measure on the ballot. *Id.* at 402–03; *see also* Mont.Code. Ann. §§ 13–27–204, –207 (2011); *Montana Pub. Interest Research Grp.*

Moreover, the position Minnesota Majority seeks to advance in this litigation is substantially the same as the position advanced by the House and Senate. We were also mindful of the expedited nature of these proceedings. For all of these reasons, we denied Minnesota Majority's motion to intervene.[3]

## II.

■ We next consider the House and Senate's argument that we lack subject-matter jurisdiction because the petitioners' claims do not fall under Minn.Stat. § 204B.44 (2010).[4] Subject-matter jurisdiction is the power of the court "to hear and determine cases that are presented to the court." *State v. Losh,* 755 N.W.2d 736, 739 (Minn.2008). The court's authority depends, in the first instance, on the claims made. *See Robinette v. Price,* 214 Minn. 521, 526, 8 N.W.2d 800, 804 (1943) (describing our jurisdiction as the authority to "hear and determine *a particular class of actions* " (emphasis added)).

■ In this case, the petition alleges that an election official—the Secretary of State—is about to commit an error by placing the ballot question passed by the Legislature on the November 2012 general election ballot. As the basis for this court's subject-matter jurisdiction, the petition itself cites only Minn.Stat. § 204B.44(a), (b), and (d). The brief accompanying the petition asserts that the ballot question also violates Article IX, Section 1 of the Minnesota Constitution because the ballot question "does not accurately describe the proposed amendment."

The House and Senate contend that the placement of the photographic identification question on the ballot is not a "cognizable 'error, omission, or wrongful act' " under Minn.Stat. § 204B.44 because the Legislature "debated, voted on, and passed" the proposed amendment and ballot question. According to the House and Senate, "[i]t is certainly not a wrongful act for the Legislature to properly exercise its constitutional authority and duty. Moreover, the Minnesota Legislature is not among the enumerated election officials listed in Minnesota Statutes section 204B.44."

We agree with the House and Senate that whether to place a proposed consti-

---

*v. Johnson,* 361 F.Supp.2d 1222, 1228 (D.Mont.2005) (describing how sponsors of a proposed Montana initiative are needed to obtain the requisite signatures). Finally, *Idaho Farm Bureau Federation v. Babbitt,* 58 F.3d 1392 (9th Cir.1995), is distinguishable because in that case the proposed intervenors, two environmental groups, had members who claimed injuries in fact as Idaho residents who would have been impacted by the measures at issue. *Id.* at 1399.

**3.** While we denied their motions to intervene, we invited and received amicus briefs from Senator Newman and Representative Kiffmeyer, and from Minnesota Majority. We also received amicus briefs from the City of Saint Paul, AARP, Citizens for Election Integrity—Minnesota, and the Hennepin County Attorney's Office.

**4.** Minnesota Statutes § 204B.44 provides:

Any individual may file a petition in the manner provided in this section for the correction of any of the following errors, omissions, or wrongful acts which have occurred or are about to occur:

(a) an error or omission in the placement or printing of the name or description of any candidate or any question on any official ballot;

(b) any other error in preparing or printing any official ballot;

(c) failure of the chair or secretary of the proper committee of a major political party to execute or file a certificate of nomination;

(d) any wrongful act, omission, or error of any election judge, municipal clerk, county auditor, canvassing board or any of its members, the secretary of state, or any other individual charged with any duty concerning an election.

tutional amendment before the people is a question that the Minnesota Constitution vests with the legislative branch. Minn. Const. art. IX, § 1. The petition does not, however, challenge the proposed constitutional amendment itself or the constitutional authority of the Legislature to submit the proposed amendment to the people. And while petitioners admittedly quarrel with positions taken during legislative debates on the proposed amendment and ballot question, and contend that the proposed amendment, if approved by voters, would require significant changes in Minnesota election law, the petition does not assert "the infirmity of the proposed amendment itself," as amici Newman and Kiffmeyer note.

Instead, petitioners challenge only the particular language of the ballot question as failing to describe accurately the proposed amendment.[5] The issue therefore is whether this court has subject-matter jurisdiction over the narrow claim of whether the ballot question is so misleading that it violates the Minnesota Constitution because it deprives voters of the constitutional right to cast a vote for or against the proposed constitutional amendment. *See Breza v. Kiffmeyer*, 723 N.W.2d 633, 636 (Minn.2006). We conclude that we have subject-matter jurisdiction to resolve this narrow issue.

■ The statute petitioners invoke—Minn.Stat. § 204B.44—provides a statutory basis for our jurisdiction. Under Minn. Stat. § 204B.44(a), we have the authority to hear claims of errors "in the placement [of] . . . any question on any official ballot." The petitioners argue that it would be an error for the Secretary of State to place the question as currently phrased on the ballot because the ballot question is "unreasonable and misleading" to such an extent that it "fails to provide voters with a fair opportunity to understand and vote." The plain language of section 204B.44 therefore gives us the authority to hear the type of dispute at issue here. *See Erlandson v. Kiffmeyer*, 659 N.W.2d 724, 729 (Minn.2003) (stating that section 204B.44 "allows any person to file a petition to correct or prevent certain types of errors, omissions, or wrongful acts").

Our precedent confirms the conclusion that we have subject-matter jurisdiction. *See Winget v. Holm*, 187 Minn. 78, 80, 244 N.W. 331, 332 (1932) (recognizing "no essential difference between submitting to the voters a candidate who has no legal right to appear on the ballot and submitting a proposed amendment to the constitution in a form therein prohibited" in upholding the court's original jurisdiction under the predecessor to section 204B.44). In *Winget*, we specifically affirmed our jurisdiction over pre-election challenges to proposed constitutional amendments. *Id.* at 81–82, 244 N.W. at 332. *Winget* was an attempt to prevent the Secretary of State from putting a proposed constitutional amendment on the ballot on the basis that it violated the single-subject rule required by Minn. Const. of 1857, art. XIV, § 1

---

**5.** The dissents argue that Article IX, Section 1 requires that the entire text of a constitutional amendment be placed on the ballot. But petitioners did not raise such an argument in their petition or briefs. Indeed, when asked at oral argument, petitioners rejected any suggestion that the proper remedy would be the placement of the amendment's text on the ballot. For their part, intervenors-respondents also do not argue that we should place the text of the photographic identification amendment on the ballot. Given that neither party has asked for the remedy advocated by the dissents, we need not and do not decide in this case whether Article IX requires the text of a proposed constitutional amendment to be placed on the ballot. That question is simply not before us here.

(now Minn. Const. art. IX, § 1).[6] *Id.* at 79, 244 N.W. at 331–32. The Secretary of State challenged our jurisdiction, arguing that the proceeding was "premature; that the adoption of a constitutional amendment [was] the composite act of the legislature and the electors and that at no point before the final act of both may the court interfere." *Id.* at 81, 244 N.W. at 332.

 In denying the Secretary of State's jurisdictional challenge, we first observed that it was settled "that courts have jurisdiction to determine whether an amendment to the constitution proposed by the legislature and submitted to the electors was proposed, submitted, and ratified conformably to the mandate of the constitution so as to become a part thereof." *Id.* at 80–81, 244 N.W. at 332 (citing *McConaughy v. Sec'y of State*, 106 Minn. 392, 119 N.W. 408 (1909)). We said that there was "no good reason" why we "should not interpose to save the trouble and expense of submitting a proposed constitutional amendment to a vote, if it be not proposed in the form demanded by the constitution," because even though such an amendment be "approved by the electors," the court would nevertheless "be compelled to declare it no part of the constitution." *Id.* at 81, 244 N.W. at 332. We reach the same conclusion here and hold that petitioners' challenge falls within the scope of our jurisdiction under section 204B.44(a).[7]

---

6. Under Article IX, Section 1, "[i]f two or more amendments are submitted at the same time, voters shall vote for or against each separately."

7. Amicus Minnesota Majority challenges petitioners' standing to bring this matter, because the petitioners raise only "concerns" about the proposed amendment and cannot show actual harm. Generally, we do not decide issues raised by an amicus that are not raised by the litigants themselves. *See, e.g., In re Blodgett*, 510 N.W.2d 910, 912 n. 2 (Minn. 1994); *State by Clark v. Applebaums Food Mkts., Inc.*, 259 Minn. 209, 216 & n. 5, 106 N.W.2d 896, 901 & n. 5 (1960) (declining to decide the constitutionality of a statute where the issue was raised only by an amicus). We may, however, decide issues raised solely by an amicus "particularly if the issue is one the court could raise sua sponte." *Kline v. Berg Drywall, Inc.*, 685 N.W.2d 12, 23–24 n. 9 (Minn.2004) (deciding whether our court had jurisdiction over a dispute, even though the jurisdictional challenge was raised solely by an amicus). Because standing is essential to our exercise of jurisdiction, the issue is one "which can be raised by this court on its own motion," *Annandale Advocate v. City of Annandale*, 435 N.W.2d 24, 27 (Minn.1989), and we therefore will decide whether petitioners have standing, even though the issue was raised only by Minnesota Majority.

To have standing a party must have "a sufficient stake in a justiciable controversy to seek relief from a court." *State by Humphrey v. Philip Morris, Inc.*, 551 N.W.2d 490, 493 (Minn.1996). A party can acquire standing in one of the two ways: (1) if the plaintiff "has suffered some 'injury-in-fact,' " *or* (2) if "the plaintiff is the beneficiary of some legislative enactment granting standing." *Id.* Minnesota Statutes § 204B.44 provides that "[a]ny individual may file a petition in the manner provided in this section for the correction of any of the following errors, omissions, or wrongful acts which have occurred or are about to occur." This statutory provision constitutes a legislative grant of standing, making the individual petitioners proper parties to this lawsuit. Moreover, we have previously held that nonprofit organizations can sue under statutes providing that "any person" may bring suit. *See State by Humphrey*, 551 N.W.2d at 495–96 (allowing Blue Cross, a nonprofit corporation, to sue under a consumer protection statute providing that "any person injured ... may bring a civil action" (emphasis omitted)). Therefore, the three nonprofit organization petitioners constitute "individual[s]" within the meaning of Minn.Stat. § 204B.44 and have standing pursuant to the statute. Because petitioners have properly filed a petition for the correction of an error in the placement of a question on an official ballot, within the legislative grant of standing in Minn.Stat. § 204B.44, we conclude that all petitioners have standing in the present dispute.

### III.

We turn next to the merits of petitioners' constitutional challenge. In essence, petitioners argue that it would be unconstitutional to submit the proposed ballot question to the voters because the question is misleading. Petitioners seek unprecedented relief—removal from the general election ballot of a proposed constitutional amendment that the Legislature passed and proposed to the people.

Petitioners point to four alleged defects in the question framed by the Legislature. First, petitioners contend that the question is erroneous because it refers to "valid photo identification," whereas the actual amendment refers to "government-issued photographic identification." Second, petitioners contend the question is erroneous because it indicates that "all voters" will have to present photographic identification, but under the text of the amendment only "voters voting in person" will have to present such identification. Third, petitioners argue that the question is erroneous because it fails to describe that absentee voters will be subject to "substantially equivalent identity and eligibility verification" requirements, as referenced in the amendment. Fourth, petitioners argue that the question is erroneous because it fails to include any information regarding the provisional balloting referenced in the amendment. Based on these errors and omissions, petitioners request that we strike the question from the ballot.

For their part, the House and Senate argue there is no requirement that all substantive provisions of the proposed amendment be included on the ballot. Indeed, according to the House and Senate, it has been the longstanding practice in Minnesota to describe only the "general purpose" of proposed constitutional amendments when those amendments are submitted to the voters in the form of ballot questions. Because the question at issue here captures the essential purpose of the amendment, the House and Senate argue that our precedent requires us to defer to the Legislature's formulation of the question.

The Minnesota Constitution textually commits to the legislative branch the authority to submit proposed constitutional amendments to the people. Article IX, Section 1 of the Minnesota Constitution provides:

> A majority of the members elected to each house of the legislature may propose amendments to this constitution. Proposed amendments shall be published with the laws passed at the same session and submitted to the people for their approval or rejection at a general election.

Minn. Const. art. IX, § 1; *see also* Op. Att'y Gen. No. 213–C (Mar. 9, 1994) (opining that amendments proposed by the Legislature are not subject to gubernatorial approval or veto). Because the constitution vests the authority to propose constitutional amendments with the legislative branch, proper respect for the separation of powers limits our authority in this area. *See* Minn. Const. art. III ("The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution."); *see also Laase v. 2007 Chevrolet Tahoe*, 776 N.W.2d 431, 437 (Minn.2009) (discussing "constitutional principle of separation of powers").

Our precedent reflects this limitation and the fact that, in our review process, we must evaluate the ballot question with a high degree of deference to the

Legislature. *Fugina v. Donovan*, 259 Minn. 35, 40, 104 N.W.2d 911, 915 (1960) (noting, that in close cases, "the controlling consideration is the deference due the legislative judgment that this is a proper proposal to amend the constitution"). The only proper question for us on review is whether "the form of ballot actually used compl[ies] with the constitution." *State ex rel. Marr v. Stearns*, 72 Minn. 200, 217, 75 N.W. 210, 214 (1898), *rev'd on other grounds*, 179 U.S. 223, 21 S.Ct. 73, 45 L.Ed. 162 (1900). In other words, our review is limited to determining whether the ballot question as framed is "'so unreasonable and misleading as to be a palpable evasion of the constitutional requirement to submit the law to a popular vote.'" *Breza v. Kiffmeyer*, 723 N.W.2d 633, 636 (Minn.2006) (quoting *Stearns*, 72 Minn. at 218, 75 N.W. at 214).[8]

Petitioners acknowledge *Breza*, but also appear to suggest that we were incorrect in *Breza* to adopt the standard articulated in *Stearns* for assessing the validity of questions involving proposed amendments to the constitution. It is accurate to state, as petitioners and the dissents do, that *Stearns* did not involve a constitutional amendment. Instead, that case arose in the context of a law concerning taxation of railroad land, which was required to be submitted to voters for approval before taking effect. *See Stearns*, 72 Minn. at 217, 75 N.W. at 214. But we specifically said in *Stearns*, "[t]he constitution requires that all amendments to that instrument shall be submitted to the people for their approval or rejection. There is no essential difference between this requirement and the one as to the submission of the [railroad land taxation] law in question." *Id.* at 218, 75 N.W. at 215 (citations omitted); *see also State v. Duluth & N. Minn. Ry. Co. (Duluth Railway)*, 102 Minn. 26, 30, 112 N.W. 897, 899 (1907) (concluding that a railroad land taxation ballot question was properly submitted because the law was "fairly expressed in the question submitted"). The constitution compelled this conclusion because the relevant constitutional provisions are virtually identical. The constitutional provision at issue in *Stearns* required that "[a]ny law [relating to railroad land taxation] ... shall ... be submitted to a vote of the people of the state." Minn. Const. of 1857, art. IV, § 32a (1871). The constitution uses nearly identical language in the provision at issue in this case: "Proposed amendments shall be ... submitted to the people for their approval or rejection." Minn. Const. art. IX, § 1.

---

8. Even though the parties in this case agree that the standard we adopted in *Breza* controls, the dissents would overrule this precedent. Because they refuse to adhere to our precedent, the dissents must then set forth a new standard. Justice Page's dissent articulates no discernible standard. Justice Paul Anderson's dissent discusses the "eye" through which the judiciary should view the ballot question and, based on the strength of yet another dissent, contends that we must view the ballot question with "a gimlet eye." *See infra* at D–21 (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 210, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (Souter, J., dissenting)). If we overturned precedent based on nothing other than the desires of individual members of this court, we would become a country not of laws, but of men. John Adams, *Novanglus No. 7* (1774), reprinted in 4 *The Works of John Adams* 99, 106 (Charles Francis Adams ed., 1851) (defining a republic as "a government of laws, and not of men"). But we do not disregard our precedent so easily. Instead, we require "compelling" reasons to depart from precedent. *SCI Minn. Funeral Servs., Inc. v. Washburn–McReavy Funeral Corp.*, 795 N.W.2d 855, 862 (Minn.2011) (noting that "[w]e are 'extremely reluctant to overrule our precedent ...' and 'require a compelling reason' to do so." (citation omitted)). The dissents articulate no such reasons, and we therefore decline the dissents' invitation to depart from our precedent.

In *Breza*, we explicitly adopted the standard articulated in *Stearns* and *Duluth Railway* in the context of reviewing the sufficiency of a ballot question used to put a proposed constitutional amendment to a popular vote. *Breza*, 723 N.W.2d at 636. After laying out the standard from *Stearns*, we held that "[t]he ballot question in this case clearly does not meet the high standard set out in our precedent for finding a proposed constitutional amendment to be misleading." *Id.* The dissents contend that our adoption of the *Stearns* standard in *Breza* was dicta. The dissents are wrong.

The petitioners in *Breza* "claim[ed] that the ballot question on the amendment [was] unconstitutionally misleading as it relate[d] to the allocation of MVST revenues between public transit and highways." *Id.* at 634. In order to answer that question, it was necessary for us to decide the standard by which ballot questions on proposed constitutional amendments would be judged. We adopted the *Stearns* standard to answer the question posed in the case. *See id.* at 636. Our adoption of the standard, therefore, was not dicta. *See State ex rel. Foster v. Naftalin*, 246 Minn. 181, 208, 74 N.W.2d 249, 266 (1956) (" 'Whenever a question fairly arises in the course of a trial, and there is a distinct decision of that question, the ruling of the court in respect thereto can, in no just sense, be called mere dictum.' ") (quoting *Union Pac. R.R. Co. v. Mason City & Fort Dodge R.R. Co.*, 199 U.S. 160, 166, 26 S.Ct. 19, 50 L.Ed. 134 (1905)).

In this case, petitioners ask the same question as was posed in *Breza*. In order to answer that question, the principle of stare decisis requires that we follow the standard adopted in *Breza*. *See, e.g., SCI Minn. Funeral Servs., Inc. v. Washburn–McReavy Funeral Corp.*, 795 N.W.2d 855, 862 (Minn.2011). The standard enunciated in *Breza*, therefore, controls our review of the ballot question at issue.

The petitioners bear the burden of demonstrating that the ballot question meets this rigorous standard, and that therefore an error exists that we must correct. *See Weiler v. Ritchie*, 788 N.W.2d 879, 882 (Minn.2010). The ballot question at issue does not violate that "high standard." *Breza*, 723 N.W.2d at 636. The proposed amendment to Article VII, Section 1 of the Minnesota Constitution would add two subsections: the first, subsection (b), requiring in part that "[a]ll voters voting in person must present valid government-issued photographic identification before receiving a ballot," and the second, subsection (c), requiring that "[a]ll voters, including those not voting in person, must be subject to substantially equivalent identity and eligibility verification prior to a ballot being cast or counted." Ch. 167, §§ 1(b), (c), 2012 Minn. Laws at 145–146. The ballot question summarizes these provisions and asks whether the Minnesota Constitution shall be amended "to require all voters to present valid photo identification to vote." *Id.* § 2(a), 2012 Minn. Laws at 146.

But petitioners argue, among other things, that the ballot question is misleading because there is a difference between "valid government-issued photographic identification," as required in the proposed amendment, and "valid photographic identification," as required in the ballot question. We agree with petitioners that there is a difference between a "government-issued photographic identification," and a "valid photographic identification." That the ballot question reads differently than the proposed amendment, however, does not render the ballot question " 'so unreasonable and misleading as to be a palpable evasion of the constitutional requirement to submit' " the proposed constitutional

amendment "'to a popular vote.'" *Breza*, 723 N.W.2d at 636 (quoting *Stearns*, 72 Minn. at 218, 75 N.W. at 214).

Petitioners also argue that the ballot question is misleading because it indicates that "all voters" will be required to present "valid photographic identification," when in fact, according to petitioners, the proposed amendment requires that only *some* voters (namely, those voting in person) present valid photographic identification. This argument is unpersuasive. Petitioners read the ballot question as narrowly referencing only the obligations placed by the proposed amendment on voters voting in person, and therefore conclude that the question is misleading because it states that the proposed amendment will require *all* voters to present photographic identification. But the ballot question does not refer specifically to only the portion of the proposed amendment that will affect voters voting in person, and petitioners are simply wrong in arguing that the proposed amendment requires only those voting in person to submit photographic identification.

Under the proposed constitutional amendment, voters voting in person "must present *valid government-issued* photographic identification," whereas all voters "must be subject to substantially equivalent identity" verification. Ch. 167, §§ 1(b), (c), 2012 Minn. Laws at 145–46 (emphasis added). The ballot question states only that "all voters [must] present valid photo identification." *Id.* § 2(a), 2012 Minn. Laws at 146. The ballot question, therefore, does not explicitly address the constitutional provision applicable only to voters voting in person (who must present valid government-issued photographic identification) nor does it explicitly address the "substantially equivalent identity" pro-

vision (which applies to all voters). Rather, the ballot question constitutes an amalgamation of the individual provisions of the proposed constitutional amendment which, taken together, can fairly be characterized as generally requiring photographic identification for all voters. *Cf.* Minn.Stat. § 204B.36, subd. 3 (2010) ("When a question is to be submitted to a vote, a concise statement of the nature of the question shall be printed on the ballot.").

Petitioners also contend that two omissions from the ballot question render the question constitutionally misleading. Specifically, petitioners argue that the ballot question does not tell voters that those voting by absentee ballot will be subject to "substantially equivalent identity and eligibility" requirements, nor does it reference the use of "provisional ballots" for voters without photographic identification. These omissions do not render the ballot question unconstitutional under our deferential standard of review.

The omission of "or substantially equivalent" does not render the ballot question misleading under our "high standard," *Breza*, 723 N.W.2d at 636, because "substantially equivalent identity ... verification" means just what it says. Equivalent is defined as "like in signification or import," or "corresponding or virtually identical [especially] in effect or function." *Merriam–Webster's Collegiate Dictionary* 392 (10th ed.2001). By definition, therefore, all voters would be required to produce valid government-issued photographic identification, or something that is substantially alike in signification or import or that is virtually identical to a valid government-issued photographic identification.[9] *Cf.*

---

9. That current statutes on absentee voting may not require photographic identification, as the dissents note, is not relevant to the question of whether the ballot question is unconstitutionally misleading. The dissents suggest that there may need to be changes in

*People v. Leng,* 71 Cal.App.4th 1, 83 Cal.Rptr.2d 433, 439 (1999) (explaining that because the equal protection guarantees of the United States and the California Constitution are "substantially equivalent" they are "analyzed in a similar fashion"); *Frey v. Comptroller of the Treasury,* 422 Md. 111, 29 A.3d 475, 495 (2011) (describing "substantially equivalent" taxes as those that are "sufficiently similar in substance to serve as mutually exclusive proxies for each other" (citation omitted) (internal quotation marks omitted)); *Ojo v. Farmers Grp., Inc.,* 356 S.W.3d 421, 433–34 (Tex.2011) (explaining that because a Texas statute specified that it provided "rights and remedies substantially equivalent to those granted under federal law," the court would determine the availability of a particular state remedy by looking to federal case law). Because all voters would present valid government-issued photographic identification or something that is virtually identical to such identification, the ballot question does not mislead voters to the extent that it is " 'a palpable evasion of the constitutional requirement to submit the law to a popular vote.' " *Breza,* 723 N.W.2d at 636 (quoting *Stearns,* 72 Minn. at 218, 75

N.W. at 214); *see also Duluth Railway,* 102 Minn. at 30, 112 N.W. at 898–99 (upholding ballot question as constitutional because the "clear and essential purpose" of the statute was "fairly expressed in the question submitted").[10]

The failure of the ballot question to mention provisional ballots likewise does not meet the high *Breza* standard. If the proposed constitutional amendment passes, voters who do not present valid government-issued photographic identification will cast a provisional ballot that will be counted only "if the voter certifies the provisional ballot in the manner provided by law." Ch. 167, § 1(b), 2012 Minn. Laws at 145–146. Petitioners point out that in *Breza* we upheld the ballot question because we could not "say the language [was] so unclear or misleading that voters of common intelligence [could not] understand the meaning and effect of the amendment." 723 N.W.2d at 636. Because the provisional ballot system is an "effect" of the proposed constitutional amendment, petitioners contend the question is unconstitutional. Petitioners' argument misinterprets what we said in *Breza.*

We did not require, as a condition of upholding the ballot question in *Breza,*

current absentee voting procedure if the people approve the amendment. Any such changes may be an effect of the proposed amendment, but, as explained below, our precedent does not require that such effects be stated in the ballot question in order for that question to pass constitutional muster.

10. *The dissents rely on the canon of construction that recognizes that when the Legislature uses different terms, it must mean different things. Based on this canon, the dissents conclude that the "government-issued photographic identification" means something different than "substantially equivalent" verification requirements, and that therefore the ballot question is a deceptive "bait and switch." The dissents' reliance on this canon is misplaced. As our precedent makes clear,* even when the Legislature has chosen different terms, we have declined to give different interpretations to those terms when, as in this case, the terms are synonymous. *See Eclipse Architectural Grp., Inc. v. Lam,* 814 N.W.2d 692, 702 (Minn.2012) (concluding where the Legislature used both the terms "service" and "delivery" in a statutory scheme that "[b]ecause service and delivery are consistently used synonymously in the context of personal service, there is no basis for us to conclude that the Legislature intended the two terms to be applied differently"); *Witso v. Overby,* 627 N.W.2d 63, 67 n. 7 (Minn.2001) (declining to interpret "declare" and "determine" differently in a statutory scheme where "[t]he difference in meaning" between the two terms "[wa]s de minimis").

that the effects of the amendment at issue be included on the ballot. Rather, our reference to the "meaning and effect" of the amendment was made in the context of ensuring that voters were able to understand the "essential purpose" of the proposed constitutional amendment. *Id.; see also Duluth Railway*, 102 Minn. at 30, 112 N.W. at 898. The "essential purpose" of the proposed amendment at issue in this case is the requirement that voters provide photographic identification in order to vote. That "essential purpose" is communicated in the ballot question. *See Breza*, 723 N.W.2d at 636.[11]

In sum, the constitutional amendment, if passed, would require that voters who vote in person present a valid government-issued photographic identification and would require that all voters present some form of identification that is substantially equivalent to a valid government-issued photographic identification. The ballot question asks the people to decide whether the Minnesota Constitution should be amended to require that all voters present "valid photo identification" to vote in Minnesota. We acknowledge that the ballot question, as framed by the Legislature, does not use the same words used in the amendment itself nor does it list all of the potential effects of implementation of the identification system contemplated in the proposed amendment. These failures may be criticized, and it may indeed have been wiser for the Legislature to include the entire amendment on the ballot.

■ The proper role for the judiciary, however, is not to second-guess the wisdom of policy decisions that the constitution commits to one of the political branches. The people are the sole judge of the wisdom of such matters. Our precedent provides us with a much more limited role in reviewing the constitutionality of the manner in which the Legislature submits proposed constitutional amendments to the people. The failures about which petitioners complain do not meet the "high standard" required for the judiciary to intercede into a matter that is constitutionally committed to the legislative branch. *Breza*, 723 N.W.2d at 636. We therefore hold that petitioners have not met their burden to prove that there is an error that requires correction.[12]

Petition denied.

Dissenting, PAGE, ANDERSON, PAUL H., JJ.

Dissenting, ANDERSON, PAUL H., J.

PAGE, Justice (dissenting).

**Bait and Switch:** the ploy of offering a person something desirable to gain favor (as political support) then thwarting expectations with something less desirable.

Bait and Switch, *Merriam–Webster Online Dictionary*, *http://www.merriam-webster. com* (last visited July 27, 2012). What we are dealing with here is a classic bait and switch.

---

11. In his dissent, Justice Paul Anderson contends that our use of the phrase "essential purpose" adds confusion as to the proper standard. We disagree. The phrase is easily understood, easy to apply, and it has been part of our law for over 100 years. *See State v. Duluth & N. Minn. Ry. Co.*, 102 Minn. 26, 30, 112 N.W. 897, 898 (1907).

12. The brief filed by petitioners in support of their petition—but not the petition itself-chal-

lenges the title for the ballot question—"Photo Identification Required for Voting"—as enacted by the Legislature. Because this issue was not raised in the petition itself, we decline to consider it. *See State v. Koppi*, 798 N.W.2d 358, 366–67 (Minn.2011) (explaining that matters not raised in a petition for review are generally waived for appellate review, and are, therefore, not considered by our court).

In April 2012 the Legislature approved a proposed amendment to Article VII, Section 1 of the Minnesota Constitution that would add two subsections to that section as follows:

> (b) *All voters voting in person* must present *valid government-issued photographic identification* before receiving a ballot. The state must issue photographic identification at no charge to an eligible voter who does not have a form of identification meeting the requirements of this section. A voter unable to present government-issued photographic identification must be permitted to submit a provisional ballot. A provisional ballot must only be counted if the voter certifies the provisional ballot in the manner provided by law.
>
> (c) *All voters, including those not voting in person, must be subject to substantially equivalent identity and eligibility verification* prior to a ballot being cast or counted.

Ch. 167, § 1, 2012 Minn. Laws 145, 145–46 (emphasis added).

The Legislature also approved the language of a question to be placed on the November 2012 ballot (the ballot question) concerning the proposed amendment. The ballot question approved by the Legislature is as follows:

> Shall the Minnesota Constitution be amended to require *all voters* to present *valid photo identification* to vote and to require the state to provide free identification to eligible voters, effective July 1, 2013?

*Id.* § 2(a), 2012 Minn. Laws at 146 (emphasis added). Finally, the Legislature approved a title for the ballot question: "Photo Identification Required for Voting." *Id.* § 2(b), 2012 Minn. Laws at 146.

I read Article IX, Section 1 of the Minnesota Constitution to require that the language of a proposed constitutional amendment itself appear on the ballot. Moreover, if there is to be a question on the ballot concerning a proposed constitutional amendment, that question cannot materially misstate the language of the proposed amendment.[1][2] The language of

1. Contrary to the court's characterizations, my issue here is not with the language of the proposed amendment itself. That is a topic for another day, as the proposed amendment itself is not before us. The court can no more legitimately claim that my criticisms of the ballot question are driven by my opposition to the proposed amendment itself, than I could legitimately claim that the court's failure to explain how "all voters" in the ballot question can be the same as "all voters voting in person" in the proposed amendment is driven by the court's support for the proposed amendment.

Rather, the question here is whether the Legislature's ballot question is deceptive and misleading. In answering that question, I express no opinion on the wisdom of the proposed amendment or its language. But, just as the court does, I must necessarily compare the language of the ballot question with the language of the proposed amendment. And it is that comparison, rather than any opinion as to the merits of the proposed

amendment, that requires me to dissent. Comparing the plain language of the proposed amendment with that of the ballot question and giving the words used their common and ordinary meanings leads to only one conclusion: the ballot question misstates, in a deceptive and misleading way, what the proposed amendment will require of voters. That I have identified a defect in the proposed amendment that makes it impossible for all voters to be subject to substantially equivalent identity verification does not mean that the Legislature's properly proposed amendment should not be put to voters. What that defect does, however, is highlight and exacerbate the defect in the ballot question.

2. The court contends that I would overrule the court's precedent for evaluating disputed ballot questions. The court misstates the nature of my dissent. I do not argue for overruling the court's precedent in this area. Rather, as I demonstrate, the court *has no precedent for this question.*

the ballot question drafted by the Legislature at issue in this case deliberately and materially misstates the language of the proposed amendment.[3] I therefore respectfully dissent.

## A.

I begin with the standard by which this court should review the Legislature's ballot question.

The court applies an extraordinarily deferential standard to the Legislature's ballot question, and does so for two apparent reasons. One, the court contends that "our authority in this area" is limited by "proper respect for the separation of powers." That premise, in turn, rests on the court's assumption that in proposing constitutional amendments, the Legislature acts under its *legislative* power. That assumption is wrong. *See In re Opinion of the Justices*, 118 Me. 544, 107 A. 673, 674 (1919) (noting that in proposing amendments to the United States Constitution, Congress "strictly speaking, [is not] acting in the exercise of ordinary legislative power. It is acting in behalf of and as the representative of the people of the United States under the power expressly conferred by article 5 [of the United States Constitution]"); *State ex rel. McKittrick v. Kirby*, 349 Mo. 988, 163 S.W.2d 990, 993 (1942) (noting that "it has been universally held that the legislature, in proposing an amendment [to the constitution], is not exercising its ordinary legislative power but is acting as a special organ of government for the purpose of constitutional amendment" and collecting cases). Indeed, if proposing constitutional amendments were part of the Legislature's legislative function, its authority to do so would be inherent in Article IV of the constitution and no separate authority (such as Article IX) would be required. To the contrary, as the Maine Supreme Judicial Court has observed in the context of amendments to the United States Constitution:

> The people, through their Constitution, might have designated some other body than the two houses or a national constitutional convention as the source of proposals. They might have given such power to the President, or to the Cabinet, or reserved it in themselves; but they expressly delegated it to Congress or to a constitutional convention.

*In re Opinion of the Justices*, 107 A. at 674. The separation of powers therefore does not limit our review of the Legislature's proposed ballot question.

Two, the court further contends that the scope of our review here is limited by precedent. Specifically, according to the court, "our review is limited to determining whether the ballot question as framed is 'so unreasonable and misleading as to be a palpable evasion of the constitutional requirement to submit the law to a popular vote.'" (Quoting *State ex rel. Marr v. Stearns*, 72 Minn. 200, 218, 75 N.W. 210, 214 (1898), *rev'd on other grounds*, 179 U.S. 223, 21 S.Ct. 73, 45 L.Ed. 162 (1900)). Our precedent does no such thing.

The court also contends that I have "articulate[d] no discernible standard" for evaluating ballot questions. I agree that there are several elements of judicial review of ballot questions that I do not address—for example, whether a ballot question must explain all of the provisions of the proposed amendment. However, the fact that the ballot question materially misstates the provisions of the proposed amendment is enough to decide this case.

3. Although the Legislature's ballot question has other deficiencies, as the petitioners have demonstrated, I focus on only two of them here, which in my view are enough to require the question be stricken and replaced on the ballot with the actual proposed amendment as drafted by the Legislature.

We have considered two previous challenges to the language of ballot questions but those cases involved challenges to ballot questions proposing *statutory,* rather than *constitutional,* amendments. *Stearns,* 72 Minn. at 207, 75 N.W. at 210; *State v. Duluth & N. Minn. Ry. Co. (Duluth Railway),* 102 Minn. 26, 26, 112 N.W. 897, 897 (1907). When *Stearns* and *Duluth Railway* were decided, the Minnesota Constitution required that any change to the law allowing railroads to pay a gross earnings tax to the state, rather than pay property taxes to local governments, be put to a popular vote. Minn. Const. of 1857, art. IV, § 32a. *Stearns* and *Duluth Railway* arose from statutory changes subject to that constitutional provision.

In 1895 the Legislature passed a law requiring that, in addition to the gross earnings tax, land not "necessarily used in the actual management and operation" of railroads be "assessed and taxed as other lands are taxed in this state." Act of Mar. 19, 1895, ch. 168, § 1, 1895 Minn. Laws 378, 378. The statutory change was placed on the 1896 general election ballot with the question: "For taxation of railroad lands." *Stearns,* 72 Minn. at 217, 75 N.W. at 214. Nevertheless, the Aitkin County Auditor did not place various parcels of railroad land on the tax rolls, claiming (among other things) that the statutory change was never "submitted to, and adopted and ratified by, the electors of the state." *Id.* at 209, 75 N.W. at 211. In particular, the County Auditor claimed that the form of the ballot question was nothing more than a "cunning political device to catch votes" and that the Minnesota Constitution "require[d] that the law itself shall be submit-

ted to the voters." *Id.* at 217, 75 N.W. at 214.

The court concluded that the statutory change had been "submitted to the electors in compliance with the constitution and the statute." *Id.* at 217, 75 N.W. at 214. In the process, the court noted that "[n]either the form nor the manner of submitting the question of the [statutory] amendment to the people is prescribed by the constitution." *Id.* at 218, 75 N.W. at 214. Rather, the court explained, the form and manner of placing the question on the ballot were "subject only to the implied limitation that they must not be so unreasonable and misleading as to be a palpable evasion of the constitutional requirement to submit the law to a popular vote." *Id.* at 218, 75 N.W. at 214. The court concluded that placement of the legislatively-proposed question on the ballot was proper, in the absence of an express constitutional requirement that the law itself be placed on the ballot. *Id.* at 218, 75 N.W. at 214–15.[4]

However, the court proceeded in dicta to compare the process of submitting a *statutory* amendment for approval by voters to the process of submitting a proposed *constitutional* amendment for approval by voters. The *Stearns* court observed that "[t]he constitution requires that all amendments to that instrument shall be submitted to the people for their approval or rejection." *Id.* at 218, 75 N.W. at 215. The court continued: "There is no essential difference between this requirement and the one as to the submission of the law in question." *Id.* at 218, 75 N.W. at 215.

In fact, however, there are *two* essential differences. First, in passing a *law* and

4. The form of a ballot question was also directly challenged as misleading in *Duluth Railway,* also a case involving a change in the taxation of railroads. 102 Minn. at 29, 112 N.W. at 898. The *Duluth Railway* court reit- erated that the form and manner of submitting a statutory change to voters "are left to the judgment and discretion of the Legislature." *Id.* at 30, 112 N.W. at 898.

submitting it to the people for their approval, the Legislature is acting within its *legislative* power. There is every reason to construe the Legislature's power in that respect broadly. In contrast, in proposing a *constitutional amendment*, the Legislature is *not* acting within its broad legislative power, but rather under limited powers specially delegated to it by the people.

Second, even if the 1871 constitution did not prescribe "the form nor the manner of submitting the question" of a statutory change to the people, *id.* at 218, 75 N.W. at 214, the unambiguous text of Article IX *does* prescribe the manner in which a proposed constitutional amendment is to be submitted to voters for approval: by placing the proposed amendment itself on the ballot. The court's observation in *Stearns* was not only dicta, it was fundamentally wrong.

Finally, the court contends here that in 2006 "[w]e explicitly adopted the standard articulated in *Stearns* and *Duluth Railway* in the context of reviewing the sufficiency of a ballot question used to put a proposed constitutional amendment to a popular vote." (Citing *Breza v. Kiffmeyer*, 723 N.W.2d 633, 636 (Minn.2006)). We did no such thing. As *Breza* notes, the petitioners in that case "concede[d] that the ballot question accurately reflects ... the proposed constitutional amendment." 723 N.W.2d at 636. Similarly, the *Breza* court agreed that "[t]he form of the ballot question conforms to the language of the proposed amendment." *Id.* Thus the sufficiency of the ballot question was not disputed in *Breza* and anything we may have said about the standard for reviewing the sufficiency of the ballot question was therefore also dicta.

The sufficiency of the ballot question at issue here is therefore a question of first impression for the court, and in formulating the standard by which we are to review the question we are writing on a blank slate. What should the appropriate standard be?

To be sure, the Legislature's choice of whether to propose a constitutional amendment subject to voter approval or pass legislation subject to gubernatorial veto is a matter entitled to significant deference. The Legislature is also entitled to significant deference with respect to the *content* of proposed amendments to the constitution. But the Legislature having proposed a constitutional amendment, our deference is to the mandate of the people as expressed in Article IX, Section 1 of the Minnesota Constitution: "Proposed amendments shall be ... submitted to the people for their approval or rejection at a general election."

But the issues presented by this case involve a right enshrined in the Fifteenth, Nineteenth, Twenty-fourth, and Twenty-sixth Amendments to the United States Constitution and in Articles I and VII of the Minnesota Constitution. The right to vote is the most fundamental of rights, because without it citizens lack the ability to protect all other rights, both enshrined in the constitutions and inherent. As the Supreme Court of the United States has said:

> "[T]he political franchise of voting" [is] a "fundamental political right, because preservative of all rights," [and] "is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."

*Harper v. Va. Bd. of Elections,* 383 U.S. 663, 667, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (quoting *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220

(1886) and *Reynolds v. Sims,* 377 U.S. 533, 561, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964)). When a proposed constitutional amendment would limit the exercise of this most fundamental of rights, this court should be especially wary. When the question placed before the voters—on the basis of which the voters will decide whether to approve or reject the proposed amendment—is deceptive and misleading, we should not only be wary; our scrutiny should be at its strictest.[5]

In other states, courts review constitutional amendments proposed by the legislature under a more exacting standard. For example, in 1982 the Florida Legislature proposed a constitutional amendment that would ban former legislators from lobbying for a 2–year period after leaving office, unless the legislator made full disclosure of his or her financial interests. Although the summary of the proposed amendment prepared by the Legislature for the ballot faithfully tracked the text of the proposed amendment, the Florida Supreme Court nevertheless struck the proposed amendment from the ballot, concluding that the ballot summary was misleading because it failed to inform voters that the proposed amendment would end an already-existing constitutional provision that imposed an *absolute* 2–year ban on lobbying by former legislators. *Askew v. Firestone,* 421 So.2d 151, 156 (Fla.1982). As the Florida court later put it,

> the gist of the constitutional accuracy requirement is simple: A ballot title and summary cannot either "fly under false colors" or "hide the ball" as to the amendment's true effect. The applicability of this requirement also is simple: It applies across-the-board to all constitutional amendments, including those proposed by the Legislature.

*Armstrong v. Harris,* 773 So.2d 7, 16 (Fla. 2000).

Similarly, in *Armstrong* the Florida court found unconstitutionally misleading a ballot summary concerning a constitutional amendment that claimed the proposed amendment "[r]equires construction of the prohibition against cruel and/or unusual punishment to conform to United States Supreme Court interpretation of the Eighth Amendment." *Id.* at 16–17. In fact, the proposed amendment would have changed Florida's constitution to ban punishment both "cruel *and* unusual." *Id.* at 17. Moreover, the Florida court found the ballot summary misleading because it claimed the purpose of the proposed amendment was to "preserve" the death penalty, when in fact the "main effect" of the amendment was to "nullify the Cruel or Unusual Punishment Clause." *Id.* at 18.

But there is no need for me to propose a standard here because even under the standard the court applies—as inappropriately deferential as it is—this ballot question fails. I turn next to that analysis.

### B.

The ballot question drafted by the Legislature here offers supporters of the requirement that voters' identities be verified by photographic identification before they can cast a ballot something desirable—the promise that all voters will be required to show photo identification in order to receive a ballot—to gain the favor of their political support for the proposed amendment. But it delivers something considerably less desirable: a constitutional amendment with many exceptions to the

---

**5.** That the subject matter of the proposed amendment itself implicates the right to vote also warrants greater scrutiny of the ballot question.

photo identification requirement. A ballot question that so materially and deliberately misstates the language of the proposed amendment to which it relates is nothing more than a bait and switch.

The plain language of the text of the proposed amendment passed by the Legislature differs markedly and materially from the proposed amendment the Legislature's ballot question describes. The ballot question asks whether the Minnesota Constitution should be amended to require "all voters" to present photo identification. But the proposed amendment as drafted requires only "voters voting in person" to present photographic identification. Unless the Legislature intends to eliminate absentee voting and mail balloting— something that proponents of the proposed amendment steadfastly and specifically denied during the Legislature's deliberations over the proposed amendment—"all voters" and "voters voting in person" are not the same. "All voters" includes "voters voting in person," but "voters voting in person" does not include "all voters." Voters voting by absentee and mail ballot do not vote in person. As a result, voters voting on the proposed amendment will not know from reading the ballot question that a "yes" vote will not in fact require "all voters" to show photographic identification in order to receive a ballot to vote. The ballot question is deceptive and misleading in that respect.

The ballot question also asks whether the Minnesota Constitution should be amended to require that "all voters" present "valid" photo identification in order to vote. But the proposed amendment's limits on a voter's photo identification are more stringent than just "valid." The proposed amendment limits the acceptable photographic identification that in-person voters must present to "valid *government-issued* photographic identification." (Emphasis added.) From the ballot question, voters would reasonably conclude that the proposed amendment would allow a voter to receive a ballot on the presentation of *any* valid photo identification, whether it be a student ID from a private college or university, a private employer's identification badge, or a photographic credit card. They would be wrong. If the proposed amendment is adopted, none of these forms of photographic identification would satisfy the constitutional requirement, regardless of their validity, because they are not "government-issued."

The court dismisses these misrepresentations as merely situations in which the ballot question could be clearer, and attributes them to the Legislature's attempt to concisely summarize the proposed amendment as a ballot question. *See Duluth Railway*, 102 Minn. at 30, 112 N.W. at 898 (explaining that courts may not review the language of a ballot question prescribed by the Legislature for a proposed statutory change "simply because" the courts may believe "the question was not phrased in the best or fairest terms").

To be blunt, in this case that is nonsense. This is not a case in which the ballot question was simply "not phrased in the best or fairest terms." *Id.* This is a case in which the words of the ballot question were phrased to actively deceive and mislead. By adding three words—"voting in person"—to the phrase "all voters" and two words—"government—issued"—to the phrase "valid photo identification," the ballot question would have been no less concise but far more accurate. The Legislature's failure to add these five words is, in my view, fatal to the ballot question.

Furthermore, the court's superficial analysis of the ballot question fails to do justice to our jurisprudence or to our role as a court. According to the court, the ballot question "summarizes" provisions of

the proposed amendment, even though the provisions of the proposed amendment are inherently contradictory. The court assures readers in one breath that the proposed amendment in fact requires all voters to submit photographic identification—and therefore the ballot question is not misleading—and admits in the next breath that some voters will be required to present something different. The court acknowledges there is a difference between "valid photographic identification" and "valid government-issued photographic identification," but then seems to dismiss the difference as something about which voters either do not care or are not entitled to be informed.

Moreover, the court takes umbrage with the dissents' approach as "[g]oing well beyond the limited nature of the question presented here" and addressing "the merits of the constitutional amendment." I have done nothing more than the court did in *Breza*—the case the court looks to as establishing our standard of review. In *Breza*, the court compared the language of the Legislature's ballot question to the language of the proposed amendment. 723 N.W.2d at 636 (concluding that "[t]he form of the ballot question conforms to the language of the proposed amendment"). I know of no other way to judge whether the Legislature's ballot question misleads voters as to the language of the proposed amendment itself.

Having rejected the Legislature's challenges to our jurisdiction here, the court's refusal to strike a ballot question so fundamentally deceptive and misleading from the ballot essentially asserts no jurisdiction at all. It would have been better for the court to dismiss the petition in its entirety, without opinion, than to establish as precedent the utter lack of oversight the court exercises here.

Simply put, the ballot question formulated by the Legislature is deceptive in that it fundamentally misstates the purpose and scope of the amendment as proposed, and does so in a way calculated specifically to garner support for the amendment from those who may not otherwise favor it. For example, there may be those who believe that everyone should be required to present photo identification, *without exception,* in order to receive a ballot to vote and who would not support anything less. By portraying the proposed amendment as requiring photographic identification of "all voters"—when in fact, if passed, the amendment will not—the deceptive ballot question falsely induces those voters to vote in favor of the amendment.

At the same time, there may be voters who believe that everyone should be required to present photo identification only if the price is right—if it does not significantly increase government spending. In fact, in order to avoid unconstitutionally restricting the right to vote, the State will be required to provide free photographic identification to eligible voters who lack it. *See Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 198, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008). The proposed amendment reflects this requirement. But surely the group of eligible voters who lack "valid government-issued photographic identification" is greater than the group of eligible voters who lack any "valid photographic identification" at all. By portraying the proposed amendment as allowing someone to vote by presenting *any* "valid photo identification," when in fact it does not, the Legislature's ballot question minimizes the cost of implementation of the proposed amendment and falsely induces this second group of voters to vote in favor of the amendment as well.

There may also be voters who favor requiring photo identification in order to

vote, but who oppose having to obtain government-issued identification, and having to provide all of the personal information the government might require as a condition of obtaining that identification, as simply too much government intrusion into their personal lives.[6] The ballot question deceives and misleads those voters who would support requiring valid photographic identification in order to vote, but who would be opposed to limiting the required valid photographic identification to government-issued identification.

I characterize these misstatements of the provisions of the ballot question as deliberate because they were called to the attention of the sponsors of the proposed amendment during the Legislature's deliberations. For example, during the March 8, 2012 meeting of the House Government Operations and Elections Committee, this colloquy occurred:

> REP. BEV SCALZE: I guess my concern is the language that will be on the ballot in November of 2012 because the language says that um . . . shall it be amended to require all voters to present valid photo identification on Election Day. But my election judges tell me that

about 20 percent of the people vote by absentee ballot and I represent a city that half of their uh . . . housing units are in multiples.

So um . . . we've made great efforts uh . . . through uh . . . multi-housing coalition and things like that to enable the managers of these units to go to the polling place. If somebody moved in November 1st and their photo ID is not current the voters are not going to be able to know that they have to make a provision for those people that maybe have a problem like that. And the 20 percent of people that vote by absentee ballot could use the last four digits of their social security number.[7]

So somebody going into the voting booth voting on this particular Amendment they don't know that. It's like we're telling them part of the story. How are you going to let the voters know that 20 percent of the people, and that's what my election judges tell me, aren't going to have to show a photo ID because they're going to be voting by absentee ballot?

---

**6.** For example, legislation passed by the Legislature in 2011 but vetoed by the Governor, which would have required photo identification to vote, required a voter to provide, among other things, "a description of the applicant in the same manner as required on an application for a Minnesota driver's license" and "the length of residence at the applicant's current address" in order to obtain a voter identification card. S.F. 509, § 7, 87th Minn. Leg.2011.

**7.** Minnesota Statutes § 203B.17, subd. 2(f) (2010), allows a voter to request an absentee ballot by providing the last four digits of the voter's Social Security number. In fact, under current law a voter can request an absentee ballot by simply "attest[ing] to the truthfulness of the contents of the application under penalty of perjury" without providing any passport, driver's license, social security,

or state identification number at all. *Id.* Before the House Government Operations and Elections Committee, Representative Kiffmeyer stated that the proposed constitutional amendment "will allow absentee voting just as our current Constitutional language in Article 7 allows for absentee voting. This will continue that practice." Hearing on H.F. 2738, H. Gov't Operations and Elections Comm., 87th Minn. Leg., Mar. 8, 2012.

Similarly, Minn.Stat. § 204B.45 (2010) allows for voting by mail in certain municipalities. In the same committee hearing, Representative Kiffmeyer stated that under the proposed amendment "mail balloting, which is popular in some of our townships uh . . . in accordance with Minnesota law will also be continued." Hearing on H.F. 2738, H. Gov't Operations and Elections Comm., 87th Minn. Leg., Mar. 8, 2012.

So this should really say that 80 percent of the voters, if that's what it is and that could be verified. How are we going to let the voters know in the ballot box?

REP. JOYCE PEPPIN: Representative Kiffmeyer.

REP. MARY KIFFMEYER: Thank you Madam Chair, Representative Scalze. Well first of all those 20 percent of the voters who are voting absentee already know those requirements because they vote absentee. So they fill out that information so I believe they are quite well aware of that and that that will be uh ... continued as is stated here today.

REP. JOYCE PEPPIN: Representative Scalze.

REP. BEV. SCALZE: And I don't mean the ... the absentee voters. Yes of course they know because they read the ballot. I mean the voters voting on this Constitutional Amendment. They don't know that 20 percent of the voters only have to show the last four digits of their social security number.

So we have two classes of voters. We have the absentee voters who could just use the last four digits of their social security number. The voters going into the voting booth in 2012 don't know that. They're on ... they're going on the ... on the uh ... idea that all voters will have to show a valid photo ID when in fact 20 percent of them won't know.

How do you educate the voters looking at your proposed amendment that says all voters?

REP. JOYCE PEPPIN: Representative Kiffmeyer?

REP. MARY KIFFMEYER: Thank you Madam Chair, Representative Scalze and members. I think you underestimate the fact that already 80 percent of Minnesotans have said that they support a photo ID requirement. Uh ... those who vote in absentee ballot are already familiar with the process and I think it will be ... you take that basis, that current basis and I'm sure there will be lots of voter education going on before the election day as well by everybody whose name is on the ballot, by all the supporting groups and I am absolutely confident they will be able to communicate the information.

But I think most importantly every voter stands in line and casts their ballot. They have personal experience with voting. They have personal experience with registering. They have personal experience already. And so the simple language of the Constitutional Amendment I think to the large majority of people is pretty straightforward and quite clear.

REP. JOYCE PEPPIN: And Representative Scalze I'd also add it says all voters to present valid photo identification on Election Day. So it's ... it doesn't say anything about absentee. So if it's Election Day they have to provide the photo identification is what the amendment says.

REP. BEV SCALZE: Thank you Ms. Chair and I understand that. It's just that the people voting on this amendment don't know that 20 percent of the people are not included with this amendment. That's the people I'm talking about, the people that are voting on this particular amendment.

REP. MARY KIFFMEYER: Madam Chair?

REP. JOYCE PEPPIN: Representative Kiffmeyer.

REP. MARY KIFFMEYER: That's the complete coverage.

REP. JOYCE PEPPIN: We'll move on....

Hearing on H.F. 2738, H. Gov't Operations and Elections Comm., 87th Minn. Leg., Mar. 8, 2012.[8] Later in the same hearing, the following comment was made:

> REP. STEVE SIMON: Just one thing. I had to address page two of the actual bill. I just want to caution—I didn't offer an amendment here, but if we're going to have a constitutional amendment, Representative Kiffmeyer, this is an engraved invitation for a lawsuit. Uh, there—as you probably know, there's—Minnesota Supreme Court authority right on point, that the question that you put to the voters has to accurately reflect what's in the actual constitutional amendment. It can't just be a, a sales job or a propaganda statement about everything that's good about it. There's nothing in here about government issue. The question that you're proposing that goes to Minnesota voters on the ballot says, "Just requiring all voters to protect [sic] valid photo ID." That's not an accurate or truthful reflection of this.
>
> So, an engraved invitation for a lawsuit unless you put "government issued," in my opinion. It also doesn't make clear that it's only at a polling place. And probably biggest of all, there's nothing in here about the brand new, never in 150 years tried in Minnesota provisional ballot system. I, I would bet my next paycheck that if you don't have all three of those and maybe more details in there, it is a unanimous Minnesota Supreme Court decision that this is just a bumper-sticker propaganda statement about the merits of the bill and not

an accurate description of the bill. Those three are very substantive parts about your proposal. I may disagree with the proposal, but that's part of your proposal—government issued, at a polling place, and provisional ballot. Instead, there's a, there's a phrase here that's being proposed to Minnesota voters, which is just kind of a sales pitch and not an accurate description.

Hearing on H.F. 2738, H. Gov't Operations and Elections Comm., 87th Minn. Leg., Mar. 8, 2012. Representative Simon may lose his bet, but his characterization of the Legislature's ballot question is accurate.

The court excuses the ballot question's deceptions and misrepresentations, contending that the ballot question merely "summarizes" parts (b) and (c) of the proposed amendment by asking "whether the Minnesota Constitution shall be amended 'to require all voters to present valid photo identification to vote.'" More specifically, the court asserts that because part (c) of the proposed amendment makes "all voters ... subject to substantially equivalent identity ... verification," those not voting in person will be required to produce "something ... virtually identical to a valid government-issued photo identification." On that basis, the court asserts that the proposed amendment "can fairly be characterized as generally requiring photographic identification for all voters." The court's reasoning is faulty for a number of reasons, not the least of which is that the only thing that is substantially equivalent to photographic identification is photographic identification.[9] If the Legislature

---

8. A transcript of the March 8, 2012 House Government Operations and Elections Committee meeting was filed with the court as an appendix to the petition. The accuracy of the transcript has not been challenged.

9. At oral argument it was suggested that as judges we do not leave our common sense at

the door. Because there is no way to subject absentee and mail ballot voters to identity verification substantially equivalent to that which in-person voters will be subject, and therefore no way under the proposed amendment "to require all voters to present valid photo identification to vote," it is the court,

had intended the term "substantially equivalent identity verification" to mean photographic identification, it would have said so, but it did not.

The court has long held that the Minnesota Constitution is to be interpreted as a statute. *State ex rel. Mathews v. Houndersheldt*, 151 Minn. 167, 170, 186 N.W. 234, 236 (1922). The court has also long held that statutory distinctions in language are presumed intentional and are applied consistently with that intent. *See, e.g., In re Stadsvold*, 754 N.W.2d 323, 328–329, 331 (Minn.2008) (holding that "practical difficulties" is a lesser standard than "particular hardship"); *Transp. Leasing Corp. v. State*, 294 Minn. 134, 137, 199 N.W.2d 817, 819 (1972) (holding that a tax statute was "by its terms directed at the use, rather than ownership, of property" because "[i]t does not say that the owner must so use the property or that the user must be the owner."). In other words, when the Legis-

lature uses two different words in the same statute, the court presumes that the Legislature means two different things. Similarly, when a constitutional amendment uses two different phrases, the court must presume that the amendment is referring to two different things.

If the Legislature had intended to require "all" voters to present photo identification in order to vote, part (b) of the proposed amendment would have so provided. It does not. The court concedes the point, and also does not interpret the proposed amendment to require *all* voters to present photographic identification. Rather, the court contends that it is enough that those not voting in person be "subject to substantially equivalent identity ... verification." But there is nothing "substantially equivalent" to the production of photographic identification in the polling place for verification of the identity of the voter who is not voting in person.[10]

---

having concluded that the ballot question is not deceptive or misleading, that has left its common sense at the door.

**10.** The purpose behind requiring in-person voters to produce valid government-issued photographic identification is presumably to ensure confidence that the person receiving the ballot is entitled to vote. For the in-person voter, the poll worker receives the prospective voter's government-issued photographic identification, somehow determines whether the identification is valid, and then, if valid, compares the information on the identification with the information contained in the voter roll for that person and compares the photo on the identification with the face of the person presenting the identification.

The court evidently believes that under the *proposed amendment all voters will be subject to substantially equivalent identity verification*. For absentee voters not appearing in person and for voters voting by mail, such a verification process is not physically possible. *It simply cannot be done.*

First, the only thing that is substantially equivalent to valid government-issued photo identification is valid government-issued photo identification.

Second, with respect to absentee and mail ballot voters, the only thing that is substantially equivalent to (1) the voter handing the poll worker the prospective in-person voter's government-issued photographic identification, (2) the poll worker determining whether the identification is valid, (3) the poll worker comparing that identification to the information on the voter roll, and then (4) the poll worker comparing the photo on the identification with the face of the person presenting the identification—to insure that the person presenting the identification is entitled to receive a ballot—all before *handing* the voter a ballot, is to take each of these same steps with respect to prospective absentee and mail ballot voters before *sending* them a ballot.

The court dismisses these problems as merely "effects" of the proposed amendment that, in the court's view, need not be reflected in the ballot question. Here again, the court wishes away the problem. It is not that the ballot question fails to disclose all of the changes the proposed amendment would require to Minnesota's voting law; rather, the problem is that there is no way to conform Minnesota's voting laws to the proposed amendment—at least not without violating

No matter what the Legislature may require of those not voting in person if this proposed amendment is adopted, there is simply no way to ensure that it is in fact the voter who has applied for the absentee ballot, who has received the ballot, who has marked the ballot, and who has returned the marked ballot. In portraying the proposed amendment as requiring "all" voters to present photo identification, the Legislature's proposed ballot question simply baits the voter by suggesting that a "yes" vote will produce a desired outcome when, in fact, the amendment will thwart the voter's expectations with something far less desirable.

Moreover, even if photographic identification satisfied the *identity* verification requirement for those voting in person, it cannot satisfy the *eligibility* verification requirement to which, under the proposed amendment, "all voters" would be subject. Eligibility to vote is defined in the Minnesota Constitution: 18 years of age or older; U.S. citizen for 3 months and a precinct resident for 30 days; and not "convicted of treason or felony, unless restored to civil rights; a person under guardianship, or a person who is insane or not mentally competent." Minn. Const. art. VII, § 1. Even if "all voters" may be able to establish "identity" through "valid photo identification" or something "substantially equivalent" to photo identification—a point I do not concede—photo identification does not disclose length of residency or confirm that the person depicted has not been convicted of a felony, is not under guardianship, and is not mentally incompetent. Verifying a voter's eligibility to vote must necessarily require something more, again to which all voters will be subject.

That the ballot question is intended to bait and switch the voter and that the proposed amendment is not intended to require all voters to present photo identification *of any kind,* even if the proposed amendment passes, is confirmed by the very sponsors of the amendment themselves. During debate on the proposed amendment, Representative Mary Kiffmeyer, one of the House authors and sponsors of the proposed amendment, stated:

> This Constitutional Amendment will allow absentee voting just as our current Constitutional language in Article 7 allows for absentee voting. This will continue that practice.
>
> In your um . . . folders today I have a copy of the current absentee . . . ballot envelope, the exterior envelope. If you'll note on that exterior envelope there is a place already to capture the Minnesota State identification card number, the driver's license number, *the last four digits of social security or a check-*

---

the representations of the proposed amendment's sponsor, without eliminating absentee voting, without eliminating mail balloting, and without violating federal law.

To highlight just one of those problems, federal law requires that Minnesota allow overseas voters and absent uniformed service members to vote by absentee ballot in elections for federal office, and that Minnesota accept from overseas voters and absent uniformed service members a single post card that simultaneously acts as a voter registration application and an application for absentee ballot. 42 U.S.C. § 1973ff-1(a)(1) (2006). There is no way to subject overseas voters and absent uniformed service members to "substantially equivalent identity . . . verification," and therefore no way that the proposed amendment can apply to "all voters" as indicated by the ballot question.

Thus, the identity of absentee voters and those voting by mail cannot be verified in a manner substantially equivalent to that required of in-person voters. To the extent the court concludes that, in essence, all voters will be required to produce photographic identification and therefore be subject to substantially equivalent identity verification, the court has swallowed the Legislature's bait, along with hook, line, and sinker.

*box in case you don't have any of those three at all.*

And so you can see there already that *this absentee ballot in its current form is already compliant with this Constitutional Amendment.*

Hearing on H.F. 2738, H. Gov't Operations and Elections Comm:, 87th Minn. Leg., Mar. 8, 2012 (emphasis added.)

According to Representative Kiffmeyer, absentee voting in Minnesota is "already compliant" with the proposed amendment, even though absentee voting in Minnesota currently does not require that any absentee voters present photographic identification—or even something "substantially equivalent" to photographic identification—in order to receive a ballot. *See* Minn.Stat. § 203B.04, subd. 1 (2010) (allowing a voter without a Minnesota driver's license, a Minnesota state identification card, or a Social Security number to request an absentee ballot); Minn.Stat. § 203B.17, subd. 2 (2010) (allowing a voter in the military, the spouse or dependent of an individual serving in the military, and a voter temporarily or permanently outside the United States to apply for an absentee ballot without access to a passport number, Minnesota driver's license or state identification card number, or the last four digits of the voter's Social Security number).

In addition, at oral argument in this case, counsel for the Legislature stated that he did not know what "substantially equivalent identity and eligibility verification" would entail, because it was subject to enabling legislation that would need to be passed by the Legislature and signed by the Governor if the amendment is approved by voters. In fact, counsel for the Legislature conceded that enabling legislation that relieved some voters of the requirement to present photo identification would not be inconsistent with the requirements of the proposed amendment.

Finally, in a brief to this court in a companion case challenging the Secretary of State's title for the ballot question at issue here, 13 current Minnesota legislators—including Representative Kiffmeyer (described as a chief author of the proposed amendment), Senate Majority Leader David Senjem, and State Senator Scott Newman (also described as a chief author of the proposed amendment) [11]—argued that the Secretary of State's title for the Legislature's ballot question—"Changes to In–Person & Absentee Voting & Voter Registration; Provisional Ballots"—is misleading, among other reasons, because:

> The Voter ID Amendment makes no changes to "voting." Rather, the Amendment requires a *prerequisite* to in-person voting. Indeed, the substantive provision that will affect most voters (in-person voters) makes clear that identification must be presented *"before receiving a ballot."*

Brief for Petitioner at 24, 26, *Kiffmeyer v. Ritchie*, A12–1258 (Minn. July 20, 2012) (citation omitted.) To be clear, "the Amendment requires a prerequisite to *in-person* voting" only—namely, the presentation of photographic identification before receiving a ballot—and is intended to make no changes for those not voting in person. (Emphasis omitted) (emphasis added). This statement by these legislative leaders, including the House and Senate authors of the proposed amendment and the Senate majority leader, gives the

---

**11.** The petitioners in *Kiffmeyer v. Ritchie*, A12–1258, included Representative Mary Kiffmeyer and Senators Scott J. Newman, Warren Limmer, Julianne Ortman, Mike Parry, Sean Nienow, David Brown, David Senjem, Bill Ingebrigtsen, Paul Gazelka, Roger Chamberlain, Ray Vandeveer, and Claire Robling.

lie to the ballot question and exposes it for what it is: deceptive and misleading. As these legislators make clear, the proposed amendment if passed will not "require all voters to present photographic identification to vote," as stated by the ballot question.

Other than suggesting—falsely—that I have acted as a fact-finder here and engaging in a bit of name-calling, the court makes no effort to explain why my analysis of the ballot question is wrong, because it cannot.

I would conclude that the ballot question proposed by the Legislature is materially and fundamentally deceptive and misleading, constitutes a bait and switch, and even applying the inappropriately deferential standard of review adopted by the court, is "so unreasonable and misleading as to be a palpable evasion of the constitutional requirement to submit the [amendment] to a popular vote." I would therefore strike the ballot question from the ballot.

C.

Because the court concludes that the language of the ballot question proposed by the Legislature is not misleading, it does not reach the question of the appropriate remedy.[12] The proper remedy is to require that the text of the proposed amendment as drafted by the Legislature be placed on the ballot, consistent with the requirements of Article IX, Section 1 of the Minnesota Constitution.[13] The text of

Article IX, Section 1 of the Minnesota Constitution clearly provides, in relevant part: "Proposed amendments shall be published with the laws passed at the same session and submitted to the people for their approval or rejection at a general election."

The court appears to assume that putting a proposed constitutional amendment before voters by means of a ballot question is inherent in the Legislature's authority to propose amendments. As discussed above, the power to propose constitutional amendments is not an exercise of ordinary legislative power inherent in the separation of powers; rather, it is a power expressly delegated to the Legislature by the people themselves. And rather than construe the power to propose amendments broadly because it is legislative power, we must construe the power to propose amendments narrowly because it is a delegated power. *See Crawford v. Gilchrist*, 64 Fla. 41, 59 So. 963, 966 (1912) (observing that "whether an amendment to the Constitution has been validly proposed and agreed to by the Legislature depends upon the fact of substantial compliance or noncompliance with the mandatory provisions of the existing Constitution as to how such amendments shall be proposed and agreed to"). We must also give effect to the will of the people. Here, the people have spoken.

Article IX, Section 1 of the Minnesota Constitution limits the Legislature's power

12. Indeed, the court contends that because petitioners asked only that the Legislature's ballot question be stricken from the ballot and did not ask that the text of the proposed amendment itself be placed on the ballot, we cannot require it. The parties may be able to ignore the requirements of the constitution, but we cannot. The constitution mandates the remedy here, irrespective of whether the parties, for whatever strategic reasons, chose not to request it.

13. If, as the court contends, my purpose in opposing the Legislature's ballot question were to prevent Minnesotans from voting on the proposed amendment, I would argue for adopting the petitioners' proposed remedy: striking the amendment from the ballot entirely.

to "propos[ing] amendments" and "publish[ing them] with the laws passed at the same session." Article IX further requires that the "proposed amendment"—nothing more, nothing less—be "submitted to the people for their approval or rejection at a general election." Nothing in Article IX contemplates a ballot question, much less a deceptive and misleading one, being either published in the laws passed at the same session or submitted to the people for their approval or rejection, *in place of* the language of the proposed amendment itself.

### D.

Underlying this case is the Legislature's purported concern about threats to the integrity of the ballot. Thus, it is ironic, if not Orwellian, that in the name of "protecting" the vote and preventing unspecified voting "fraud," the Legislature has resorted to a ballot question that deliberately deceives and misleads the very voters it claims must be protected. I cannot explain, nor can I understand, the court's willingness to be complicit with the Legislature in this effort. Nor can I explain or understand the court's fear of putting before voters for their approval or rejection the actual language of the proposed amendment as drafted by the Legislature. Therefore, I respectfully dissent.

ANDERSON, PAUL H., J. (dissenting).

I join in the dissent of Justice Page.

ANDERSON, PAUL H., Justice (dissenting).

Government is instituted for the security, benefit and protection of *the people,* in whom all political power is *inherent,* together with the right to *alter, modify*

*or reform government* whenever required by the public good.

Minn. Const. art. I, § 1 (emphasis added).

\* \* \* \* \* \*

I respectfully dissent.

I write separately because the current Legislature has violated the Minnesota Constitution by refusing to put the text of a proposed constitutional amendment on the November 6, 2012 general election ballot. The Legislature compounds this constitutional violation by proposing to instead place an inaccurate, misleading, and deceptive question on the November ballot. By its actions, the Legislature has placed its will over the will of the people, as expressed in Minnesota's Constitution. The unfortunate result of the Legislature's actions, as affirmed by the majority, is the implementation of a process to amend Minnesota's Constitution which deprives Minnesotans of their constitutional right to knowingly consent to a constitutional amendment that will, if approved, "alter, modify or reform" their government. Minn. Const. art. I, § 1. For reasons more fully explained below, I cannot join the majority opinion of our court.

### I. ISSUE STATEMENT AND OVERVIEW

In April 2012 the current Minnesota Legislature adopted a proposed constitutional amendment to Article VII, section 1 of· the Minnesota Constitution. Ch. 167, 2012 Minn. Laws 145–46. The Legislature intends to seek the people's consent to this amendment at the November 6, 2012 general election. When the Legislature approved the text of the amendment, it also approved a ballot question that it intends to place on the so-called "pink" ballot for the general election.[1] The Legislature

---

1. The pink ballot is used for constitutional amendments. *See* Minn.Stat. § 204D.11, subd. 2 (2010).

does not intend to place the text of the proposed constitutional amendment on the pink ballot.

Petitioners, including the League of Women Voters, allege that defects in the ballot question approved by the current Legislature render the question unconstitutional and therefore the proposed constitutional amendment must be stricken from the ballot. More specifically, the League asserts that the ballot question is inaccurate, misleading, and deceptive because it improperly describes or fails to describe important substantive provisions contained in the proposed amendment and thus evades the constitutional requirement to submit the proposed amendment to the voters. The Legislature, which is the primary respondent for purposes of briefing and oral argument,[2] argues that the Minnesota Constitution grants it exclusive authority over the form and content of a ballot question. Alternatively, the Legislature argues that if our court has the power to review a ballot question, that power is very limited, such that our review is so deferential to the Legislature's authority that even an inaccurate, misleading, or deceptive ballot question is beyond our power to strike from the ballot.

As I noted at oral argument, the issues our court must decide seldom are much bigger than those raised here. The League and the current Legislature ask us to determine what process the people of Minnesota have mandated in Minnesota's Constitution for how they can give their consent to a constitutional amendment proposed by the Legislature. As part of this question, the parties also ask us to determine whether the Minnesota Constitution grants to the Legislature the exclusive authority to design the form and content of a ballot question, and whether our court has the authority to review the constitutionality of a ballot question designed by the Legislature. According to the majority: (1) the Legislature has the exclusive authority to design the form and content of a ballot question; (2) our court must defer to the Legislature when the Legislature exercises its authority to design the form and content of a ballot question; and, (3) the ballot question the current Legislature intends to place on the November 6, 2012 ballot is not "so unreasonable and misleading as to be a palpable evasion" of the requirements of the Minnesota Constitution. I disagree with this holding.

A significantly different point of view informs my analysis. When the issues before our court are properly framed, the decision we should render is not difficult to ascertain—it is even inevitable. It is a fundamental principle of constitutional law that our court has the authority to decide the issues before us because Minnesota is a constitutional democracy, and in a constitutional democracy the highest court has the ultimate duty to uphold the will of the people as expressed in their constitution. Thus, our court has a duty under the Minnesota Constitution to answer the questions the parties have submitted to us. Minn. Const. art. VI, § 1.

Because the issues before us center squarely on the correct interpretation of language used in the Minnesota Constitution, the search for an answer must begin by looking at the Constitution's text, in particular the text of Articles I and IX.

---

2. Secretary of State Mark Ritchie, the named respondent, declined to file a brief on the merits. For the reasons explained in the majority's opinion, we granted the 87th Minnesota House of Representatives' and the 87th Minnesota Senate's motion to intervene, but denied the motions to intervene that we received from State Senator Scott J. Newman, State Representative Mary Kiffmeyer, and Minnesota Majority, Inc.

Article I provides that all *inherent political power* in Minnesota originally resides with the people and only the people have "the right to alter, modify or reform government whenever required by the public good." Minn. Const. art. I, § 1. The text of Article I could not be more clear—the ultimate power to "alter, modify or reform government" by amending the Minnesota Constitution resides exclusively with the people. *Id.*

When the text of Article I is examined together with the text of Article IX, it is not that difficult to ascertain the process the people have mandated to "alter, modify or reform" Minnesota's government by amending the Constitution. The second time the plain text of Article IX provides the answer. In simple and straightforward language, the people have mandated in Article IX that "[p]roposed amendments shall be . . . submitted to the people for their approval or rejection at a general election." Minn. Const. art. IX, § 1. It is both logical and reasonable that the people of Minnesota mandated that the full text of any amendment to Minnesota's Constitution be submitted to them, because in the Constitution the people reserved to themselves the ultimate authority to determine how they are to be governed.

The plain language of the Minnesota Constitution and in particular the language of Article IX does not grant, either expressly or implicitly, to the Legislature the power to design the form and content of a ballot question that replaces the text of a proposed constitutional amendment on a general election ballot. Indeed, Article IX does not grant to the Legislature any power to submit a separate ballot question to the people. Most certainly, Article IX does not grant the Legislature the authority to design and submit an inaccurate, misleading, or deceptive question to the people. Simply stated, the Legislature does not have this power under the Constitution—inherent or otherwise.

In 2012 the current Legislature chose to follow a specific route in its effort to "alter, modify or reform" how Minnesotans exercise their fundamental right to vote. The Legislature did not choose to make this significant change by means of an ordinary legislative act, which, under Article IV of the Minnesota Constitution, requires the consent of the Governor.[3] Rather, the Legislature chose to follow a different, more difficult route—amending Minnesota's Constitution by seeking the consent of the people, as opposed to the consent of the Governor. Having chosen this route, the Legislature must follow the rules established by the people for altering, modifying, or reforming their government by constitutional amendment.

It is the duty of our court—the Minnesota Supreme Court—to correctly read, interpret, and apply the text of Minnesota's Constitution. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178, 2 L.Ed. 60 (1803) (stating it is the "essence of judicial duty" for a court to follow the Constitution). More than 200 years ago Chief Justice John Marshall[4] articulated the obligation that this duty imposes on a court when it interprets a constitution. Chief Justice Marshall said that a court "when impelled by duty to render [a constitutional inter-

---

**3.** The current Legislature had previously attempted to pass similar voter-identification measures as legislation, but the governor vetoed the legislation. *See* S.F. 509, ch. 69, 87th Minn. Leg. (Minn. May 23, 2011). The Legislature then undertook to design the voter-identification requirement at issue in this case as a constitutional amendment rather than as ordinary legislation.

**4.** John Marshall was the fourth Chief Justice of the United States Supreme Court. He served in that capacity from 1803 to 1834.

pretation], would be unworthy of its station, if it were unmindful of the solemn obligations which that station imposes." *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 128, 3 L.Ed. 162 (1810).

Our court must be mindful of the solemn obligations presented by this case—obligations that require us to conduct a thoughtful, in depth, conscientious, and objective analysis of the issues before us. For the people's sake, we must do everything within our power to get it right. It is both logical and reasonable that the people of Minnesota followed the lead of our country's founders and Chief Justice John Marshall when they mandated that judicial review be an essential mechanism to protect their rights from the "ill humors" of a public majority or assembly.[5]

A critical step in my legal analysis involves the juxtaposition of the process the current Legislature intends to implement for amending the Constitution with the constitutional amendment process mandated by the people under the plain text of Minnesota's Constitution. This juxtaposition leads me to a conclusion that is different from that reached by the majority. I conclude that the process mandated by the Minnesota Constitution for obtaining the consent of the people is incompatible with the process the Legislature seeks to implement and the majority ratifies. When such incompatibility exists—a constitutional mandate versus legislative action—it is the fundamental law embodied in and mandated by the Constitution that must prevail. *Marbury*, 5 U.S. (1 Cranch) at 178–79. If we follow the people's mandate, as expressed in the Constitution, our court has no alternative but to render a decision holding that the full text of any proposed constitutional amendment must be submitted to the people for their consent. Therefore, I conclude that the full text of the proposed constitutional amendment, approved by the current Legislature in April 2012, must appear on the pink ballot submitted to voters at Minnesota's November 6, 2012 general election.

A majority of the members of our court does not agree with my conclusion; therefore, I must dissent. That I dissent with a clear and strong voice is important, because when the people of Minnesota cast their votes at the November 6 general election, their will, as expressed in Minnesota's Constitution, will not be implemented. The people will not have before them the text of the proposed constitutional amendment. That text contains the critical information the Constitution requires for the people to validly give their consent; something the Legislature's ballot question does not contain. The majority, by deferring so completely to the Legislature and allowing an unconstitutional process for amending Minnesota's Constitution to be implemented, has allowed the Legislature to thwart the will of the people as expressed in the Constitution. The result is astounding. At the final step in the constitutional amendment process the people of Minnesota will be presented with an inaccurate, misleading, and deceptive ballot question. This failure by the Legislature to follow the Constitution seriously undermines the power of the people of Minnesota to be self-governed. In essence, the Legislature upstages the people by assuming the primary role in the amendment process and relegating the people to a secondary role.

Minnesotans need to know that the ballot question designed by the current Legislature should not be on the ballot; certainly, it should not be on the ballot because it is inaccurate, misleading, and deceptive. Nevertheless, it is on the bal-

---

**5.** The Federalist No. 78 (Alexander Hamilton).

lot, and consequently there is a high probability that the people will not knowingly consent to a constitutional amendment that will alter, modify or reform their government.

## II. DISSENT OUTLINE

This dissent will proceed as follows. First there is a brief legislative and procedural history of the case. Second, there is the legal analysis detailing the basis for the dissent and the grounds for disagreeing with the majority. The legal analysis begins with a discussion of the special nature of constitutions and an explanation of the difference between fundamental or higher law and ordinary legislative acts. This section is followed by an examination of the critical role courts play in interpreting constitutions and implementing the people's will. Next, there is a discussion of Minnesota's Constitution, its relevant history, and its mandate for how it is to be amended. The next section demonstrates why the proposed amendment process presents an issue of first impression and specifically why *Stearns*, *Duluth Railway*, and *Breza* are not controlling.[6] This analysis is followed by a discussion detailing how and why the ballot question approved by the current Legislature is defective and therefore unconstitutional.

The analysis also demonstrates why there is no safe harbor where our court can seek shelter in order to avoid the essence of its judicial duty; that is, dealing with the key issue before us. The dissent ends with some observations that focus on the authenticity and credibility of certain critical aspects of this case. The analysis of the legal issues before our court is atypically long for a dissent; but the importance and significance of the issues before the court, especially those involving interpretation and amendment of the Minnesota Constitution, not only warrant, but require, such an in-depth analysis.[7]

## III. THE PROPOSED AMENDMENT

In 2012 the current Legislature passed H.F. 2738, a bill that proposed an amendment to the Minnesota Constitution that would, among other things, require voters to present certain identification before voting. Ch. 167, §§ 1–2, 2012 Minn. Laws 145–46. Under section 1 of H.F. 2738, Article VII, section 1, of the Minnesota Constitution would be amended in the following ways:

---

6. *See Breza v. Kiffmeyer*, 723 N.W.2d 633 (Minn.2006); *State v. Duluth & N. Minn. Ry. Co.*, 102 Minn. 26, 112 N.W. 897 (1907); *State ex rel. Marr v. Stearns*, 72 Minn. 200, 75 N.W. 210 (1898), *rev'd on other grounds* 179 U.S. 223, 21 S.Ct. 73, 45 L.Ed. 162 (1900).

7. At this point, a cautionary note is in order. In footnote one, the majority criticizes the dissents for engaging in "fact-finding." The majority's criticism is off-target because this dissent does not engage in fact-finding, much less explore at length "the alleged negative impact" of the adoption of the proposed amendment. The dissent makes clear that the merit of the proposed amendment is a question for the people to decide, and focuses on the plain text of Minnesota's Constitution and the negative impact of the inaccurate, misleading, and deceptive ballot question. The majority fails to appreciate the huge difference between these two concepts.

My reaction is that the majority's assertions are either intended to distract the reader from the main issue before us and certain weaknesses in the majority's analysis; or, the majority recognizes that its own analysis clearly has a significant focus on the proposed constitutional amendment and is written to satisfy a need to distract the reader from this focus.

The first alternative is probably the correct one. I do not believe that the majority or either dissent is driven by support for or a lack of support for the proposed amendment. The *majority apparently wants to draw attention away from the central issue—the plain text of the Minnesota Constitution. Readers are cautioned not to be sidetracked by this effort.

Section 1. *(a)* Every person 18 years of age or more who has been a citizen of the United States for three months and who has resided in the precinct for 30 days next preceding an election shall be entitled to vote in that precinct. The place of voting by one otherwise qualified who has changed his residence within 30 days preceding the election shall be prescribed by law. The following persons shall not be entitled or permitted to vote at any election in this state: A person not meeting the above requirements; a person who has been convicted of treason or felony, unless restored to civil rights; a person under guardianship, or a person who is insane or not mentally competent.

*(b) All voters voting in person must present valid government-issued photographic identification before receiving a ballot. The state must issue photographic identification at no charge to an eligible voter who does not have a form of identification meeting the requirements of this section. A voter unable to present government-issued photographic identification must be permitted to submit a provisional ballot. A provisional ballot must only be counted if the voter certifies the provisional ballot in the manner provided by law.*

*(c) All voters, including those not voting in person, must be subject to substantially equivalent identity and eligibility verification prior to a ballot being cast or counted.*

## A. The Ballot Question

The current Legislature debated how to best submit the proposed constitutional amendment to a vote by the people. At one point during the debates, the following form and content of a ballot question was under consideration:

Shall the Minnesota Constitution be amended effective December 1, 2013, to require that all in-person voters present an approved form of government-issued photographic identification or equivalent at the time of voting; that those not voting in person provide government-issued proof of identity; that all voters be subject to substantially equivalent eligibility verification before a ballot is cast or counted; and that the state provide at no charge an approved photographic identification to eligible individuals?

S.F. 1577, § 2, 87th Minn. Leg.2012. But, the current Legislature rejected this comprehensive language. Instead, a majority of the Legislature voted in favor of the less-comprehensive language we have before us. Under section 2 of chapter 167, the proposed constitutional amendment will be presented to the people for their approval or rejection on the November 6, 2012 ballot in the following form:

Shall the Minnesota Constitution be amended to require all voters to present valid photo identification to vote and to require the state to provide free identification to eligible voters, effective July 1, 2013?

Ch. 167, § 2(a), 2012 Minn. Laws at 146. It is this less comprehensive language that the Legislature approved and seeks to use as the ballot question on the November 2012 ballot.

## B. The Governor's Veto

Under Minn. Const. art. IV, § 23, the Legislature must present to the governor every bill the Legislature passes. The governor can then approve or veto the bill. If the governor vetoes the bill, the Legislature may override the veto by a two-thirds majority vote in both houses of the Legislature. *Id.* In accordance with Article IV, section 23, the Legislature submitted H.F. 2738 to Governor Mark Dayton. After

receiving H.F. 2738 and in accordance with his constitutional authority, Governor Dayton vetoed the bill. The current Legislature did not override Governor Dayton's veto.

Governor Dayton made clear in his veto message that he opposed the proposed constitutional amendment and was vetoing its title, stating:

> Although I do not have the power to prevent this unwise and unnecessary Constitutional Amendment from appearing on the Minnesota ballot in November, the Legislature has sent it to me in the form of a bill. Thus, I am exercising my legal responsibility to either sign or veto the amendment. I am vetoing the amendment and its title; and I urge Minnesotans to reject it in November.

Letter from Mark Dayton, Governor of Minn., to Kurt Zellers, Speaker of the House, Minn. House of Representatives (Apr. 9, 2012). The Governor went on to explain why he vetoed the proposed amendment and title and why he was returning H.F. 2738 to the Legislature. The Governor's explanation contains many of the reasons the League has outlined in its brief and in oral argument as to why the ballot question is defective. Therefore, relevant parts of the Governor's veto message bear repeating here.[8]

## IV. PETITIONERS' CHALLENGE

The League commenced this action based on the language of the ballot ques-

tion set out in section 2 of chapter 167. The League argues that the ballot question is unconstitutionally misleading both in its description of the proposed amendment and in its omissions. Specifically, the League argues that the ballot question is misleading in the following four ways: (1) the question states that "all voters" will be required to provide photographic identification but the proposed constitutional amendment only requires this identification of "in person" voters; (2) the question omits any mention of the proposed constitutional amendment's "substantially equivalent" verification provision; (3) the question fails to disclose that only "valid, government-issued photographic identification" will qualify as acceptable identification; and, (4) the question fails to disclose that the proposed constitutional amendment implements a provisional-voting system. The current Legislature responds to the League's argument, stating the Legislature "is not required to select a ballot question that 'is the best and fairest that could have been framed by a trained lawyer.'" The Legislature argues that our court has traditionally deferred to the Legislature's choice of language when submitting proposed amendments to the people.

## V. LEGAL ANALYSIS

*We are in bondage to the law in order that we may be free.*

---

8. The Governor said:
> This amendment is a proverbial wolf in sheep's clothing. It goes far beyond its stated intention to require Photo ID's. Instead, it dismantles Minnesota's Best-in-the-Nation election system ... would end same day voter registration ... and require an entirely new system of provisional balloting....
> A constitutional requirement that "all voters must be subjected to substantially equivalent identity and eligibility verification"

places barriers to voting on our seniors who no longer drive, our soldiers who vote overseas, and our students who attend colleges and universities away from home. It will make voting much harder for thousands of other eligible voters, who will find it difficult or impossible to attain government-issued photo identifications in order to prove their identities ... Virtually no class of voter is left unscathed by these extreme alterations in our citizens' access to their elections.

-Cicero [9]

### A. CONSTITUTIONS: HIGHER LAW VS. ORDINARY LAW

Given that the Minnesota Constitution embodies the most basic and fundamental law adopted by the people of our state, some preliminary commentary about the role of constitutions is in order.

Constitutions are special documents. America's legacy to the world is a written Constitution that was submitted to the people for their approval. The United States Constitution remains the quintessential constitution that people around the world speak of, look to, and read for inspiration. This is true because the principles and ideals the United States Constitution establishes for a constitutional democracy are fundamental and universal.

In 1988, Justice Lawrence Yetka, writing for our court in *State v. Hamm*—a case interpreting the Minnesota Constitution—explained why the U.S. Constitution is a written constitution and why it is unique and special. Justice Yetka said:

> When the makers of our constitution [U.S. Constitution] insisted on a written constitution, this was an unique idea in both the 18th and 19th centuries. However, the makers did so deliberately with a purpose in mind. England has never had any one written constitutional document. Its constitution consists of a series of significant documents in English history, starting with the Magna Charta. Other rights are protected by tradition on the assumption that Parliament will not tamper with those rights except at its peril. The American colonists feared the vagueness and uncertainty of such a system, *with the possibility of abuse by future rulers. Accordingly, they insisted on enumerating permanently certain*

*limitations of the power of government. They specified that all government derives its power from the governed and that all powers not enumerated as being given to government were reserved in the people.* Thus, where we have a clear understanding, as we do in this case, as to what our constitution [Minnesota Constitution] meant in 1857, as defined almost contemporaneously in 1869 by this court, the only way that constitution should be changed is by the consent of the people in the form of a constitutional amendment *as provided by the constitution itself.*

*State v. Hamm,* 423 N.W.2d 379, 382–83 (1988) (emphasis added).

Constitutions establish the machinery of government and are designed to protect the people's rights and freedoms, through basic and fundamental law. Importantly, they are not on the same "level with ordinary legislative acts." *Marbury,* 5 U.S. (1 Cranch) at 177. While a legislature cannot bind its successors with an ordinary legislative act, constitutional law is designed to last into the future—to bind future generations. Constitutions are different from ordinary law not only because they are concerned with basic or fundamental law, but also they are more difficult to revise than ordinary law. *Id.* at 176. Unlike ordinary law, a constitution is not "alterable when the legislature shall please to alter it." *Id.* at 177.

The Legislature does not define the constitutional limits of its legislative powers, nor ultimately can it decide them. Within its powers its legislative judgment is supreme, it does not divide its duty with the courts, and to it the courts ascribe competent knowledge.... Nor in determining whether the legislation is within the constitutional powers

---

9. Cicero, *Pro Cluentio* 146.

of the Legislature do the courts divide their duties with the coordinate branch of the government. They cannot abdicate. If the Legislature transgresses its constitutional limits the courts must say so, for they must ascertain and apply the law . . .

*State v. Fairmont Creamery Co.*, 162 Minn. 146, 157, 202 N.W. 714, 719 (1925) (citation omitted).

Constitutions bind the people and their public assemblies to the basic and fundamental value choices embodied in a constitution. This binding of the people to the basic or fundamental law embodied in a constitution reflects the people's mistrust of any governmental authority placed above them. It is through a constitution that the people protect themselves and preserve their basic rights and freedoms from the Sirens' song of the future tyranny of public assemblies or the "ill humors," that may emanate from the people themselves.[10] The Federalist No. 78 (Alexander Hamilton). To paraphrase Cicero, Minnesotans have bound themselves to both the United States Constitution and the Minnesota Constitution in order that they may be free.

Elections are the primary method used by the people to hold their leaders accountable. Elections are an institutionalized, peaceful means by which the people can revolt against those they have entrusted with limited sovereign power. Elections are the method the people use to hold those with sovereign power accountable or even to remove those people from office when they fail to be responsive to the people's will. Constitutions in a democracy embody and protect the basic right under which elections are implemented—the fundamental right to vote. The right to vote is why the case currently before our court is so important. We are addressing a case that involves that fundamental right and how that right is and will be embodied in and protected by the Minnesota Constitution.

## B. The Court's Role in Interpreting a Constitution

Courts play an essential role in a constitutional democracy. In the simplest terms, the United States and Minnesota Constitutions are contracts between the people and their government—governments that the people specifically vest with limited sovereign powers. In *Marbury v. Madison*, Chief Justice John Marshall observed that the U.S. Constitution is an express declaration of our society's most cherished and fundamental principles:

That the people have an original right to establish, for their future government, such principles as, in their opinion, shall most conduce to their own happiness, is the basis on which the whole American fabric has been erected. The exercise of this original right is a very great exertion; nor can it, nor ought it, to be frequently repeated. The principles, therefore, so established, are deemed fundamental: and as the authority from which they proceed is supreme, and can seldom act, they are designed to be permanent.

5 U.S. (1 Cranch) at 176. The founders of both our country and our state understood

---

10. Jon Elster refers to this concept as a democratic people's precommitment against any future weakening of will. Elster states that people bind themselves to the basic and fundamental law of a constitution much like Ulysses bound himself to his ship's mast to protect himself against the foreseeable future weakness he would experience when he heard the Sirens' song. Ulysses understood that hearing the Sirens would deprive him of rational thoughts. *See* Jon Elster, *Intertemporal Choice and Political Thought, in* Choice Over Time 35, 37–45 (George Lowenstein & Jon Elster eds., 1992).

that an independent judiciary is "peculiarly essential" to protect constitutional guarantees. The Federalist No. 78, at 484 (Alexander Hamilton) (Henry Cabot Lodge ed., 1923). The judiciary has a duty to ensure that government remains faithful to the Constitution and does not breach the contract. As Hamilton said in Federalist 78:

> Limitations of this kind [i.e., constitutional restraints on legislative authority] can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing.

*Id.* In essence, when interpreting a constitution, the courts are to enforce this contract between the people and their government.

When the judiciary faithfully performs its duty, it serves as a bulwark against potential tyranny by either the legislative or the executive branch. It enforces the rights guaranteed and reserved to the people in their constitution. The genius of our constitutional system—and the special role of the judiciary within that system—was not lost on Alexis de Tocqueville, one of the nineteenth century's most prominent and astute observers of life and politics in the United States, who famously remarked that

> the power granted to American courts to pronounce on the unconstitutionality of laws still forms one of the most powerful barriers that have ever been raised against the tyranny of political assemblies.

Alexis de Tocqueville, *Democracy in America* 98 (Harvey C. Mansfield & Delba

Winthrop eds. & trans., Univ. of Chi. Press 2002) (1835). Courts have a duty to act as the special guardians of constitutional liberty, a duty that no court or any individual judge should take lightly or shirk. As Chief Justice Marshall explains:

> The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligation which that station imposes.

*Fletcher v. Peck*, 10 U.S. (6 Cranch) at 128. Put another way, courts cannot avoid their emphatic duty to "say what the law is," *especially* when that law is the fundamental law expressed by the people in a constitution. *Marbury*, 5 U.S. (1 Cranch) at 177.

Our supreme court has a duty to ensure that the people of Minnesota receive the full protection of the U.S. Constitution. We also have a co-equal duty to "independently safeguard for the people of Minnesota the protections embodied in our constitution." *State v. Askerooth*, 681 N.W.2d 353, 362 (Minn.2004). The special role of state supreme courts to interpret and enforce the protections of state constitutions is a unique aspect of the American federal system.[11] While *all* citizens of the United States are entitled to the protection of the rights guaranteed in the U.S. Constitution, our court has consistently held that the Minnesota Constitution may afford the citizens of Minnesota even greater protection of individual civil rights and liberties than the U.S. Constitution. *See Kahn v. Grif-*

---

11. *See generally* Paul H. Anderson & Julie A. Oseid, *A Decision Tree Takes Root in the Land of 10,000 Lakes: Minnesota's Approach to Protecting Individual Rights Under Both the United States and Minnesota Constitutions,* 70 Alb. L.Rev. 865, 869–70 (2007).

*fin,* 701 N.W.2d 815, 828 (Minn.2005); *O'Connor v. Johnson,* 287 N.W.2d 400, 405 (Minn.1979). Put another way, the U.S. Constitution is a floor, not a ceiling, and the citizens of Minnesota are entitled to dual constitutional protection that may not fall beneath that floor, but in some instances extends above the floor.

Our court has long approached the task of interpreting the Minnesota Constitution with great care—even delicacy. *See Kahn,* 701 N.W.2d at 828. But delicacy does not mean we can abdicate our duty to interpret and enforce both the U.S. Constitution and the Minnesota Constitution. *State v. Fuller,* 374 N.W.2d 722, 726 (Minn. 1985) (stating that "[s]tate courts are, and should be, the first line of defense for individual liberties within the federalist system").

It should now be very apparent that in our constitutional democracy, the judiciary has a duty to fulfill its special role and provide the appropriate checks-and-balances that underscore our separation-of-powers system. One way the judiciary provides appropriate checks and balances is by deferring to the Legislature when the judiciary should, refusing to defer to the Legislature when it should not, and objectively distinguishing between the two sets of circumstances. Here, the ballot question approved by the current Legislature is not an ordinary legislative act to which we should defer. Rather, the question before us is a constitutional question, asking whether the process by which the Legislature seeks to amend the Minnesota

Constitution complies with the rules that the people established therein.

In addition, the acts of the Legislature regarding the amendment process, and the ballot question, bear on the fundamental right of Minnesota citizens to vote. The Supreme Court has held that

> [e]specially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be *carefully and meticulously scrutinized.*

*Reynolds v. Sims,* 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (emphasis added). Legislative actions that implicate the right to vote must be given a *"close and exacting examination." Kramer v. Union Free Sch. Dist. No. 15,* 395 U.S. 621, 626, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (emphasis added). This standard has been adopted in Minnesota. *See Emison v. Growe,* 782 F.Supp. 427, 435 (D.Minn.1992) (citing *Reynolds,* 377 U.S. at 562, 84 S.Ct. 1362). I could not agree more. When voting rights are involved, we must conduct a careful, exacting, even meticulous review.

The case before us clearly affects Minnesotans' access to the voting franchise.[12] Rather than take the majority's approach of reviewing the ballot question "with a high degree of deference to the Legislature," we must examine the process by which the current Legislature drafted the ballot question for the proposed constitutional amendment with a skeptical eye.[13]

---

**12.** This is true both because of the misleading nature of the ballot question, which inhibits voters' opportunity to exercise their voting right by inhibiting their free choice, *see infra* Section V.F., and because the proposed amendment changes the way that Minnesotans can access the voting franchise, *see infra* Part VI.

**13.** "Skeptical eye" is the term used by Justice David Souter, based on the U.S. Supreme Court's holding in *Reynolds. Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 210, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (Souter, J., dissenting) ("[t]he Judiciary is obliged to train a skeptical eye on any qualification of [the fundamental right to vote]" (citing *Reynolds,* 377 U.S. at 562, 84 S.Ct. 1362)).

Some might even say that our examination of this final step in the amendment process—the submission of the ballot question to the people without the full text of the proposed constitutional amendment—calls us to train a gimlet eye [14] on the whole process.

## C. MINNESOTA'S CONSTITUTION(S): SOME RELEVANT HISTORY

The constitution Minnesota's citizens adopted in 1857 is still in effect, even though we started with two constitutions—a Democratic draft and a Republican draft. A review of some of the relevant history of Minnesota's Constitution is helpful to our analysis of the issues before us because the present Constitution represents Minnesota's original law. In 1857, the constitutional amendment process was a major area of discussion and dispute when the original constitution(s) were drafted, and both the Democratic and Republican drafts contained the exact same language for adopting proposed constitutional amendments. Indeed, as shown below, the relevant language has survived for over 150 years and remains part of the Constitution that we are interpreting today. *Compare* Minn. Const. art. IX, § 1, *with* Minn. Const. of 1857: Democratic Version, art. XIV, § 1, *and* Minn. Const. of 1857: Republican Version, art. XIV, § 1.

In February 1857, the United States Congress passed the Enabling Act for a State of Minnesota, which paved the way for Minnesota's statehood and admission into the Union on May 11, 1858 and allowed the people of Minnesota to create a state government and to hold a constitutional convention. *See* Act of Feb. 26, 1857, ch. 60, 11 Stat. 166. The first elections for the nascent state government were fraught with aggressive campaign tactics and partisan acrimony between the Republican and Democratic Parties, including many accusations of election fraud. *See* William Anderson, *The Constitution of Minnesota*, 5 Minn. L.Rev. 407, 415 (1921). This acrimony extended to the constitutional convention.

The constitutional convention first met on July 13, 1857, and representatives of both political parties attempted to be the first to call the convention to order. But, the first meeting quickly became chaotic, which led the two political parties to meet separately and work on their own drafts of the new constitution. With each political party claiming legitimacy and blaming the other party's delegates for the disharmony, the separate meetings continued for the balance of the convention. For the next three weeks, each political party drafted a separate constitution until, finally, in August, certain delegates from both parties realized that a compromise was necessary to preserve the legitimacy of the new state.[15]

The compromise, however, stalled over bitter disagreement on three key issues: the location of the State Capital; congressional, legislative, and judicial apportionment; and whether the issue of African–American suffrage should be left to a vote of the people along with the constitution. In order to save the constitutional convention process, the Republicans relented to the Democrats on all three issues, asking for only one thing in return—that the constitution allow for an easy way to submit future amendments to the voters for their

---

14. "Gimlet" is defined as "having a piercing or penetrating quality." Merriam–Webster's Collegiate Dictionary 492 (10th ed.2001). Appropriately, "gimlet-eyed" means "sharp-sighted." *Id.*

15. *See generally* Anderson & Oseid, *supra* note 11, at 887–93 (2007).

consideration. The Republicans believed that a liberal amendment article would allow a future constitutional amendment to grant voting rights to African Americans, even if a vote on that issue was left out of the original constitutional approval process. Following the compromise, each political party adopted the new *document* without much debate or change.[16]

The 1857 constitution is still in effect today, which makes it one of our country's oldest state constitutions. It has been amended several times and has undergone one major revision. In 1971, the Legislature created the Minnesota Constitutional Study Commission to study how the constitution could be modernized and reformed. The result of the Commission's work was a proposed constitutional amendment to change "the appearance, if not the substance, of the Constitution."[17] On November 5, 1974, the people of Minnesota voted to adopt the reform amendment. It is important to keep in mind that the 1974 amendment revised but did not replace the 1857 Constitution. Therefore, the 1857 Minnesota Constitution remains the source of original intent and the final authority in matters of state constitutional law.

### D. AMENDING MINNESOTA'S CONSTITUTION

With this history, we can now turn to considering what, exactly, is the process for amending the Minnesota Constitution. The amending article of the 1857 Constitution reads in part as follows:

Whenever a majority of both houses of the legislature shall deem it necessary to alter or amend this constitution, they may propose such alterations or amendments, which proposed amendments *shall be* published with the laws which have been passed at the same session, and said amendments *shall be* submitted to the people for their approval or rejection.

Minn. Const. of 1857, art. XIV, § 1 (emphasis added).

The language in the 1857 constitution is plain: proposed amendments "shall be submitted to the people...." *Id.* Significantly, the plain text of the Constitution's original article was preserved during the 1974 revisions.[18] The second sentence of Article IX now reads, "Proposed amendments shall be published with the laws passed at the same session and submitted to the people for their approval or rejection at a general election." Minn. Const. art. IX, § 1. In this sentence "shall" applies to both the publication of the proposed amendments and their submission to the people of Minnesota, because it operates upon the key verb phrase ("be" published or submitted), which the clause requires for grammatical coherence. Put more simply, the sentence only makes sense if read to mandate submission of a proposed amendment to the voters. *State ex rel. Gardner v. Holm*, 241 Minn. 125, 129–30, 62 N.W.2d 52, 55–56 (1954) (stating that when construing the Constitution, our court gives ordinary meaning to the words used).

---

16. For more information, *see id.* at 890 ("A plethora of men copied the compromise constitution in longhand in one evening. One constitution was written on white paper and signed by fifty-three Republicans. One copy was written on blue paper and signed by fifty-one Democrats. In all, there were 299 differences between the two drafts, most of which have been categorized as non-substantive." (internal citations removed)).

17. *Comments on the Restructured Constitution of 1974, in* 1 Minn.Stat. Ann. 129, 129 (West 1976).

18. The revisions altered the ordering and numbering of the articles in the constitution; the article for amending the constitution was moved from article XIV to article IX.

The foregoing interpretation receives further and nearly conclusive support in the Constitutional Study Commission's report accompanying the 1974 proposed reforms. In its report, the Commission carefully listed each article and noted which provisions were being changed substantially and which were not. Specifically listed under the "Provisions Not Recommended for Change" was "[s]ubmission of amendments to voters by simple majority of both houses." [19]

The plain meaning of the Constitution could not be more clear: proposed amendments shall be presented to the people of Minnesota for their consent. Just as proposed laws must be presented to the Governor for signature or veto under Article V,[20] under Article IX a proposed amendment must be presented to the people of Minnesota for their consideration and consent. Our court stated earlier this year, "If the plain language ... is clear and free from all ambiguity, we will not disregard the letter of the law under the pretext of pursuing its spirit." *Rohmiller v. Hart*, 811 N.W.2d 585, 589 (Minn.2012); *see also Tuma v. Comm'r of Econ. Sec.*, 386 N.W.2d 702, 706 (Minn.1986) ("Where the words of a statute are clear and free from ambiguity, we have no right to construe or interpret the statute's language. Our duty in such a case is to give effect to the statute's plain meaning." (citation omitted)).

It is possible that someone could argue that the word "submission" in the context of Article IX is ambiguous—that it means or could mean something other than the presentation of the text of a proposed amendment to the people of Minnesota; but, this argument lacks merit. Such an interpretation is not supported by consideration of what is meant by submission or "to submit."

Black's Law Dictionary notes that "submit" means "[t]o end the presentation of further evidence ... and tender a legal position for decision...." Black's Law Dictionary 1466 (8th ed.2004). The American Heritage Dictionary in part defines "submit" as "[t]o commit [something] to the consideration or judgment of another." American Heritage Dictionary 1790 (3d. ed.1992). In neither case, nor in the other available definitions, is there any allusion to *further* or additional context beyond that which has been submitted. In fact, the definition from Black's contravenes such a reading: to submit is to "end the presentation"; the act of submission is in itself an act of completion.

The meaning of the text of Article IX—proposed amendments "shall be ... submitted to the people for their approval or rejection at a general election"—is plain. Its direction is clear. The entire text of any proposed constitutional amendment must be submitted to the people of Minnesota for their consideration on a general election ballot.[21]

---

**19.** *Comments on the Restructured Constitution of 1974*, supra note 17, at 143.

**20.** Minn. Const., art. IV, § 23.

**21.** There is an additional relevant point that should be added to this discussion. Article IX says that proposed amendments "shall be published" with the session laws, and then submitted to voters. It would be difficult to believe that merely publishing a legislatively composed ballot question in the session laws, rather than the entire amendment, would be sufficient to meet this provision of the constitution. If that were the case, the text of proposed amendments could be held virtually in secret—neither published in the session laws nor submitted to the voters. Under the majority's approach, the same verb construction ("shall be") in the same sentence is held to mean the full text of the amendment in one instance, and apparently some arbitrary summary composed by the Legislature in another instance.

### E. A CASE OF FIRST IMPRESSION

To avoid placing the text of the proposed constitutional amendment on the ballot and to rebut the clear meaning of Minnesota's Constitution, the current Legislature argues that there is controlling Minnesota case law holding that the full text of proposed amendments need not be submitted to the people for their consent. But a careful review of our case law shows that we have, in fact, never considered the specific meaning of Article IX; we have only addressed it when considering parallel, yet distinct, issues.

The current Legislature argues that three of our cases control the outcome of this issue. *See Breza v. Kiffmeyer,* 723 N.W.2d 633 (Minn.2006); *State v. Duluth & N. Minn. Ry. Co. (Duluth Railway),* 102 Minn. 26, 112 N.W. 897 (1907); *State ex rel. Marr v. Stearns,* 72 Minn. 200, 75 N.W. 210 (1898), *rev'd on other grounds* 179 U.S. 223, 21 S.Ct. 73, 45 L.Ed. 162 (1900). But as Justice Page discusses in his separate dissent, none of these cases is, in fact, controlling here. While the case law upon which the Legislature and the majority rely may be interesting, it should not, and does not, bind us.

Two of the decisions, *Stearns* and *Duluth Railway,* addressed constitutional provisions that required certain *statutory* changes to be approved by voters. On February 21, 1871, while still in the midst of a railroad bonding scandal, the Legislature proposed to voters a constitutional amendment which would require any change to the statute allowing railroads to pay a gross earnings tax, instead of a property tax, to be approved by a majority of voters—a process that echoes, but is not, the constitutional amendment process. On November 8, 1871, Minnesota voters approved the amendment. *See* Minn. Const. of 1857, art. IV, § 32A (1871) (re-pealed 1974), *in* 1 Statutes at Large of Minnesota 45, 51 n.* (Bissell 1873).

We have twice considered challenges to laws passed pursuant to the now-repealed 1871 constitutional amendment. *See Duluth Railway,* 102 Minn. at 29, 112 N.W. at 898; *Stearns,* 72 Minn. at 217, 75 N.W. at 214. We noted in explaining the requirement to submit the proposed statutory amendments to voters that "[n]either the form nor the manner of submitting the question of the amendment to the people is prescribed by the constitution. These are left to the judgment and discretion of the legislature...." *Stearns,* 72 Minn. at 218, 75 N.W. at 214. There are two essential insights into the holdings of *Stearns* and *Duluth Railway,* as articulated by Justice Page, that bear repeating here. First, the sentence quoted above refers to a *statutory amendment,* and second, in both *Stearns* and *Duluth Railway* we considered the process by which voters could participate in the approval of an *ordinary law* and not a *constitutional amendment.*

Further, the constitutional provisions that were applied in *Stearns* and *Duluth Railway* had additional differences that distinguish them from the current case. Most significantly, when we discuss amending the constitution, we are considering a power held by the *people* of Minnesota, which, in Article IX, they have delegated in part to the Legislature. The first sentence of Article IX provides that, with this delegated power, the Legislature "may propose" constitutional amendments for consideration by the people. Minn. Const. art. IX, § 1. *Stearns* and *Duluth Railway* involved a wholly different function—the inherent *legislative* powers contained in Article IV. Here it is helpful to contrast our prior holding that " '[l]egislative power ... is the authority to make laws,' " *State ex rel. Univ. of Minn. v. Chase,* 175 Minn. 259, 267, 220 N.W. 951,

954 (1928) (quoting *Springer v. Philippine Islands*, 277 U.S. 189, 202, 48 S.Ct. 480, 72 L.Ed. 845 (1928)), with our later observation that "the only way that [the] constitution should be changed is by the consent of the people in the form of a constitutional amendment as provided by the constitution itself.... If a written constitution can be amended by statute or by judicial fiat, it retains no sanctity whatsoever." *State v. Hamm*, 423 N.W.2d 379, 383 (Minn.1988).

The distinction between the power to amend the Constitution (which rests with the people of Minnesota and has only been partially delegated to the Legislature) and the power to make laws (which is inherently legislative) is of the highest importance when the constitutional amendment at issue involves, and would restrict, the right to vote—one of the most fundamental of rights held by the citizens of our state. The U.S. Supreme Court has described the right to vote as "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *see also Davis v. Davis*, 297 Minn. 187, 193, 210 N.W.2d 221, 225 (1973) ("voting, 'a fundamental political right ... preservative of all rights.'" (quoting *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964))); *see also South St. Paul v. Hetherington*, 240 Minn. 298, 303, 61 N.W.2d 737, 740 (1953) (stating that "[t]he right to vote on a basis of reasonable equality with other citizens is a fundamental and personal right essential to the preservation of self-government. Fundamental rights may be lost by dilution as well as by outright denial").

To be sure, the petitioners in *Stearns* argued that the voter-approved statutory change was invalid because the "law itself" was not submitted to the voters. 72 Minn. at 217, 75 N.W. at 214. And our court in *Stearns* disagreed, noting that a ballot question was sufficient, and then speculating that "[t]here is no essential difference between [the constitutional amendment process] and the one as to the submission of the [statute] in question." *Id.* at 218, 75 N.W. at 215.

But any comment by our court in either *Stearns* or *Duluth Railway* regarding the process of amending the Minnesota Constitution is dicta by definition. There are two kinds of dicta, obiter dicta and judicial dicta. Obiter dictum is "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential...." Black's Law Dictionary 1102 (8th ed.2004). Or as this court has stated, "Statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand are obiter dicta, and lack the force of an adjudication." *Wandersee v. Brellenthin Chevrolet Co.*, 258 Minn. 19, 28, 102 N.W.2d 514, 520 (1960) (quotation omitted).

Judicial dicta represent "[a]n opinion by a court on a question that is directly involved, briefed, and argued by counsel, and even passed on by the court, *but that is not essential to the decision.*" Black's Law Dictionary 485 (8th ed.2004) (emphasis added). Judicial dicta are generally given much greater weight than obiter dicta, *see Bush v. Arrowood*, 302 Minn. 188, 208, 224 N.W.2d 489, 501 (1974), but are not binding, *id.*

The whole process considered in *Stearns* and *Duluth Railway* was different from the process for amending the Minnesota Constitution. The process in both cases regarded a statutory change, containing all of the checks and balances of the legislative process—including the Governor's signature—and housed within the powers of the Legislature under Article IV. There

was simply no reason at that time for the court to weigh in on the process used for amending the Constitution, a process that was not at issue in either case. At best our commentary in *Stearns* and *Duluth Railway* was judicial dicta ("passed on by the court, but ... not essential to the decision"), but even more likely such gratuitous speculation was simply obiter dicta ("[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision"). Under either definition, *Stearns* and *Duluth Railway* are not controlling for the present case.

The majority concludes that whatever distinctions can be found between our early case law and the present case were removed in 2006 when our court adopted the standard from *Stearns* and *Duluth Railway* in *Breza v. Kiffmeyer*, 723 N.W.2d at 636. But just like *Stearns* and *Duluth Railway*, *Breza* is distinguishable and does not control here. *Breza*, like the case before us, involved a dispute about the appropriate standard for determining whether the ballot question related to a proposed constitutional amendment was misleading. But *Breza* is not on point. Petitioners in *Breza* commenced an action to enjoin the Minnesota Secretary of State from proceeding with the general election on a proposed constitutional amendment because they alleged the ballot question was unconstitutionally misleading. *Id.* at 634. Yet the "[p]etitioners concede[d] that the ballot question accurately reflecte[d] ... the proposed constitutional amendment." *Id.* at 636. Thus, the constitutional mandate to submit the constitutional amendment to the voters was not in issue and the concession functioned to end the disputed issue in the litigation. Following the concession, there was no reason for our court to engage in anything more than a cursory analysis. Once our court makes a finding that "end[s] the controversy ... the rest of the language in the opinion [is]

obiter dicta." *Keller Constr. Co., Inc. v. Commercial Union Ins. Co.*, 379 N.W.2d 533, 536 n. 2 (Minn.1986). Thus, *Breza* at best provides a weak foundation for the majority's analysis, a foundation that crumbles when subjected to any level of scrutiny.

The end result of the foregoing review of our case law is that we have never faced or decided a case on the merits which directly addresses the process for amending the Minnesota Constitution. Not in *Stearns*, not in *Duluth Railway*, and not in *Breza*. Moreover, any commentary in these cases on the process for amending the constitution is dicta. Thus, I conclude that the case before us, in which we must address the process of amending the Minnesota Constitution, is a case of first impression.

Even if the holdings in *Stearns*, *Duluth Railway*, and *Breza* were on point, these cases should not and cannot bind our court today. *Stearns* and *Duluth Railway* unnecessarily considered the process by which the Minnesota Constitution is amended. *Breza* looked to *Stearns* and *Duluth Railway* with only the most cursory analysis. *Breza* simply is not a well-considered opinion on the issue of amending the Minnesota Constitution. It is not wrong to look to *Stearns*, *Duluth Railway*, or *Breza*, nor is it disingenuous to seek guidance there; but once these cases are scrutinized it is problematic to cling to them for legal support. These three did not provide a solid foundation upon which to build the decision in this case, especially when the text of the constitution is considered.

Our court is compelled by duty to render judgment on laws that violate the constitution. "There is no longer any doubt of the authority and duty of the court ... to declare such acts invalid, if repugnant to

the constitution." *Ames v. Lake Superior & M.R. Co.*, 21 Minn. 241, 282 (1875). Put more fully by Chief Justice John Marshall:

> The question, whether an act, repugnant to the constitution, can become the law of the land, is a question deeply interesting to the United States; but happily, not of an intricacy proportioned to its interest.... It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or that the legislature may alter the constitution by an ordinary act.
>
> Between these alternatives there is no middle ground. The constitution is either a superior, paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and like other acts, is alterable when the legislature shall please to alter it.
>
> If the former part ... be true, then a legislative act contrary to the constitution is not law: if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power, in its own nature illimitable.

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176–77, 2 L.Ed. 60 (1803). In short, we may not follow precedent that has been shown to be wrong.

Our duty does not allow us, much less require us, to affirm the current Legislature's flawed process for amending the Constitution just because that flawed process has been used in the past. The Legislature asserts that ballot questions have been used in the past when proposed constitutional amendments were presented to the people, that this past practice supports their actions, and that we should be guided by and follow this past practice because that is how we do it in Minnesota. It is an argument that we should address, but when the argument is examined carefully it readily becomes evident that it cannot prevail here—it lacks merit. Multiple wrongs do not make a right. This is one of the first lessons we learn as children and we must follow that lesson here. If the position that the current Legislature is arguing had prevailed in the past on issues of great import, then separate but equal could still be the law of the land,[22] children could still be laboring long hours in the coal mines of Appalachia,[23] and we could still be executing children[24] and the mentally ill.[25] Or more recently, consider the U.S. Supreme Court's decisions in two

---

**22.** *See Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), *overruled by Brown v. Bd. of Educ.*, 347 U.S. 483, 495, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("We conclude that in the field of public education the doctrine of 'separate but equal' has no place.").

**23.** *See Carter v. Carter Coal Co.*, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936), *abrogated by U.S. v. Darby*, 312 U.S. 100, 115–16, 61 S.Ct. 451, 85 L.Ed. 609 (1941) ("[I]t was held by a bare majority of the Court over the powerful and now classic dissent of Mr. Justice Holmes setting forth the fundamental issues involved, that Congress was without power to exclude the products of child labor from interstate commerce. The reasoning and conclusion of the Court's opinion there cannot be reconciled with the conclusion which we have reached....").

**24.** *See Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), *abrogated by Roper v. Simmons*, 543 U.S. 551, 556, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ("In [*Stanford*], a divided Court rejected the proposition that the Constitution bars capital punishment for juvenile offenders in this age group. We reconsider the question.").

**25.** *See Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *overruled by Atkins v. Virginia*, 536 U.S. 304, 307, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) ("[I]n the 13 years since we decided [*Penry*], the American public, legislators, scholars, and judges have deliberated over the question whether the death penalty should ever be imposed on a mentally retarded criminal.").

landmark cases where the Court rejected prior case law in favor of its reading of the U.S. Constitution's true meaning.[26] When faced with the situation we have before us today—a clear contradiction between past practice and the plain language of Minnesota's Constitution—our court " 'would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes.' " *Limmer v. Swanson,* 806 N.W.2d 838, 841 (Minn.2011) (Anderson, J. concurring) (quoting *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 128, 3 L.Ed. 162 (1810)). Again, we cannot be unmindful of the obligations this situation imposes, and we may not affirm or allow a practice that is repugnant to the constitution to continue.

## F. THE BALLOT QUESTION: INACCURATE, MISLEADING, OR DECEPTIVE?

As I indicated in the overview section, the answer to the key issue before us, when properly framed, is clear, even inevitable: The Minnesota Constitution requires the Legislature to present the people with a ballot containing the full text of a proposed constitutional amendment. The majority ignores the plain meaning of Article IX, section 1 when it concludes that the current Legislature has the power to submit the proposed constitutional amendment to the people solely in the form of the ballot question it adopted in April 2012. The majority compounds this error when it wrongly holds that our review is limited to determining whether the Legislature's proposed ballot question is "so unreasonable and misleading as to be a palpable evasion of the constitutional requirement to submit the amendment to a popular vote." *Breza,* 723 N.W.2d at 636.[27]

Even if the majority were correct, and the current Legislature has the authority to submit its proposed ballot question to the people—either with or without the full text of the proposed constitutional amendment—the ballot question proposed by the current Legislature is so inaccurate and

---

26. In *District of Columbia v. Heller,* the Court significantly expanded Second Amendment rights, with Justice Antonin Scalia writing that, even if " 'hundreds of judges' " relied on prior case law, that reliance "cannot nullify" citizens' reliance on the constitution's "true meaning." 554 U.S. 570, 624 n. 24, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). And in *Lawrence v. Texas,* the Court overturned Texas's antisodomy law, with Justice Anthony Kennedy writing that "[t]he doctrine of *stare decisis* is essential to the respect accorded to the judgments of [courts] and to the stability of the law. It is not, however, an inexorable command." 539 U.S. 558, 577, 123 S.Ct. 2472, 156 L.Ed.2d 508 (citing *Payne v. Tennessee,* 501 U.S. 808, 828, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). Justice Kennedy further noted that prior cases can be overturned when their rationale "does not withstand careful analysis." *Id.*

27. The majority claims that the *Breza* standard controls our court's review of the case. I have already explained why that is not so.

The majority aggravates its error by vacillating between the standard it purports to adopt and a previously-unheard-of "essential purpose" standard. In *Breza,* we held that the language of the ballot question was not "so unclear or misleading that voters of common intelligence cannot understand the meaning and effect of the amendment," and therefore the question could be submitted to the people. 723 N.W.2d at 636. The majority now contends that *Breza* does not mean what it says. According to the majority, a ballot question need not explain the "effect" of a proposed amendment so long as it conveys its "essential purpose." Presumably, the majority's "essential purpose" standard is more deferential than the standard enunciated in *Breza;* it allows the Legislature to convey even less information to the people. Either way, the majority's inability to clearly articulate a comprehensible standard only underscores why the plain language of Article IX, section 1 mandates that the Legislature submit the text of the proposed constitutional amendment directly to the people.

misleading that it violates Article IX, section 1 of the Minnesota Constitution. The majority essentially admits that the ballot question is misleading, but claims the question does not violate our so-called "rigorous constitutionally misleading standard." The majority is wrong. The ballot question is unconstitutionally misleading, even under the deferential standard articulated by the majority. More specifically, the majority acknowledges that "the ballot question, as framed by the Legislature, does not use the same words as the amendment itself and it does not list all of the effects of implementation of the identification system contemplated in the proposed amendment." The majority maintains, however, that it is not our court's role to determine "the simplest and fairest form of the question submitted...." *Duluth Railway*, 102 Minn. at 30, 112 N.W. at 898. But the majority misses the point when it defines our role so narrowly. Our court's concern over the Legislature's ballot question should be and is far more profound than a mere quibble over semantics.

The current Legislature has proposed a ballot question so defective that it essentially strips the people of their right to consent to a substantial change to the Minnesota Constitution.[28] An amendment to the Constitution works a foundational change to the nature of the social contract between the people and their government. Here, the Legislature seeks to have the people approve a ballot question that will, if approved, fundamentally alter the way Minnesotans vote. Yet the Legislature's ballot question fails to truthfully inform the people of the meaning and effect of the proposed amendment in four critical areas: (1) by stating that "all voters" will be subject to the same identification requirements even though the proposed amendment has no such requirement, (2) by failing to inform the people that the only type of identification accepted to prove one's eligibility to vote is "valid government-issued photographic identification," (3) by stating that the necessary identification will be provided to the people for "free," and (4) by failing to inform the people that the proposed amendment would implement a new system of provisional voting. Any one of these four inaccuracies and omissions alone would render the ballot question unconstitutional on the grounds that it is misleading and most likely deceptive. Certainly, the *sum* of these inaccuracies and omissions unquestionably render the ballot question unconstitutional.

The majority dismisses the ballot question's inaccuracies and omissions because it reviews the current Legislature's ballot question with a high degree of deference. Yet the majority concedes that the judiciary *must review* the current Legislature's proposed ballot question. That review must begin by comparing the text of the proposed ballot question with the text of the proposed constitutional amendment.[29]

---

28. This legislative claim offends the core principles of our constitutional democracy because, as we have emphatically stated, "The constitution belongs to the people. They have adopted it and they alone can amend it. Neither the Legislature nor this court has any right to bypass the people under the guise of a liberal interpretation which would amend the constitution, no matter how desirable the amendment might be." *Knapp v. O'Brien*, 288 Minn. 103, 106, 179 N.W.2d 88, 90 (1970).

29. Similarly, when the Legislature uses two different words in the same statute, this court presumes that the Legislature means two different things. *See Johnson v. Paynesville Farmers Union Co-op. Oil Co.*, 817 N.W.2d 693, 709 (Minn.2012) ("The use of different words in the two provisions supports the conclusion that the sections address different behavior."); *Torgelson v. Real Prop. Known as 17138 880th Ave.*, 749 N.W.2d 24, 27 (Minn. 2008) ("Although 'debt' and 'liability' can be synonymous, it is presumed that if the Consti-

How else could the judiciary determine whether a ballot question was unconstitutionally misleading—even under the majority's deferential standard? Surely the Legislature does not have *carte blanche* to submit a ballot question that is completely unmoored from the language of a proposed constitutional amendment. Put differently, if the Legislature passed a proposed constitutional amendment that provided funding for trails in Minnesota, the Legislature could not submit a ballot question to the people that stated the proposed constitutional amendment was about flying people to the moon.[30]

### 1. "All Voters"

The current Legislature's affirmative misstatement in the ballot question of the express language of the proposed constitutional amendment is, in and of itself, sufficient to render the ballot question unconstitutionally misleading. I make this point separately to supplement Justice Page's observations, because Justice Page's point bears repeating: the Legislature's ballot question materially and fundamentally misstates the language of the proposed constitutional amendment.

The majority claims that the current Legislature's inaccurate ballot question passes constitutional muster because the proposed constitutional amendment re-

quires all voters to present photographic identification or its "substantial equivalent." Thus, the majority reasons, the Legislature summarized the proposed constitutional amendment "as generally requiring photographic identification for all voters." But simply saying something is so does not make it so.[31] The ballot question, contrary to the express language of the proposed constitutional amendment, asks whether "all voters" should be required to present photographic identification. *See* Ch. 167, § 2(a), 2012 Minn. Laws 145–46.

An obvious consequence of the current Legislature's inaccurate ballot question is that a voter of common intelligence cannot make an informed decision to vote "yes" or "no" at the November general election. A voter of common intelligence, when confronted with the Legislature's ballot question, would sensibly conclude that *all voters* must present valid photographic identification. But that voter—whether of common or even exceptional intelligence—would be wrong. I agree with Justice Page when he notes that the ballot question therefore falsely induces the support of the proposed constitutional amendment's most vocal proponents; it also provokes the wrath of the proposed constitutional amendment's most vocal antagonists. It should be beyond dispute that a ballot question that materially mis-

tution's authors used two different words, they intended two different meanings."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law* 170–73 (2012) (discussing the "presumption of consistent usage" as a contextual canon of statutory interpretation). We should apply the same presumption when the Legislature uses two different terms in a session law that proposes a constitutional amendment.

30. At oral argument, one of my colleagues posed this exact hypothetical to counsel for the current Legislature. Counsel claimed that such a ballot question "may or may not"

violate the Minnesota Constitution. I submit that counsel overstated the difficulty of my colleague's question.

31. When searching for the meaning of a word, courts must be very cautious to avoid stepping through the looking glass, where Humpty Dumpty resides and words lose all meaning. *See* Lewis Carroll, *Alice's Adventures in Wonderland and Through the Looking Glass* 254 (Knopf 1992) (1865). (" 'When I use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what I choose it to mean—neither more nor less.' ").

leads the voters by misstating the language of a proposed constitutional amendment evades "the constitutional requirement to submit the law to a popular vote," and must be deemed unconstitutional. *Breza*, 723 N.W.2d at 636.

### 2. Valid Government–Issued Photographic Identification

The proposed constitutional amendment requires in-person voters to present "valid government-issued photographic identification." Ch. 167, § 1(b), 2012 Minn. Laws 145–46. In contrast, the ballot question designed by the current Legislature only refers to "valid photographic identification." *Id.*, § 2(a), 2012 Minn. Laws at 146. The majority acknowledges that there is a difference between "government-issued photographic identification" and "valid photographic identification." But the majority then contends that the Legislature's omission of the crucial "government-issued" qualifier from the ballot question, while misleading, is not misleading enough to violate the Minnesota Constitution. In essence, the majority concludes that the defective ballot question is *close enough.*

I strongly disagree for several reasons. The difference between *"government-issued photographic identification"* and *"valid photographic identification"* is not benign; it is very significant. The current Legislature's ballot question fails to convey the most basic information about the proposed amendment, i.e., the specific form of identification that in-person voters must bring with them to the polls on election day. A voter of common intelligence would reasonably conclude that "valid photographic identification" encompasses identification issued by a wide range of private, non-governmental entities such as an employer, a private university, or even Sam's Club. The proposed constitutional amendment actually requires in-person voters to produce a much more limited and restrictive class of identification than the ballot question indicates. Even the deferential *Breza* standard adopted by the majority— as deferential and abstract as that standard is—makes clear that there is a constitutional boundary the Legislature cannot breach when formulating a ballot question. Thus, the Legislature's failure to truthfully inform the people what form of identification the proposed amendment requires of in-person voters is a breach that renders the ballot question unconstitutional.[32]

### 3. Free Identification?

The ballot question asks whether the Minnesota Constitution should be amended to "require the state to provide *free* identification to eligible voters." Ch. 167, § 2(a), 2012 Minn. Laws 145–46 (emphasis added). This is not a true statement. The proposed constitutional amendment does

---

**32.** Regardless of whether one agrees with or disagrees with the proposed constitutional amendment on the merits—a question beyond the scope of our review—the ballot question's failure to include the "government-issued" qualifier misleads the people as to the impact of the proposed constitutional amendment. Requiring in-person voters to present "government-issued photographic identification" represents a significant change—maybe even a sea-change—in Minnesota election law. As petitioners point out, very few states strictly require voters to present "government-issued" photographic identification before they can cast their vote. *See* Wendy R. Weiser & Lawrence Norden, Brennan Center for Justice at NYU School of Law, *Voting Law Changes in 2012* 4–5 (2011), http://www.brennancenter.org/content/resource/voting_law_changes_in_2012. Even if the current Legislature were able to prove that Minnesota's voter identification regime requires a major overhaul—something it has not done and likely cannot do—the ballot question fails to convey to the people the most basic information about the proposed constitutional amendment.

not require that the state provide voters with "free" identification. Rather, the amendment provides: "[t]he state must issue photographic identification at *no charge* to an eligible voter who *does not have a form of identification meeting the requirements of this section*." *Id.*, § 1(b) (emphasis added).

The current Legislature's use of the term "free" in the ballot question is at best misleading and most likely deceptive for an important reason: the ballot question's use of the term "free" conceals the true cost of the photographic identification requirement.

"Free" is defined as "not costing or charging anything." Merriam–Webster's Collegiate Dictionary 463 (10th ed.2001). And while it is true that the amendment, if adopted by the people, requires the state to provide identification to eligible voters at "no charge," acquiring government-issued photographic identification is anything but "free." To the contrary, eligible voters who lack current or otherwise valid identification must provide the State with supporting documentation to obtain their "free" identification, typically one supporting primary document and one supporting

secondary document. *See* Minn. R. 7410.0100–.0600 (2009). The cost of obtaining the required supporting documentation, especially for elderly and vulnerable populations, can be substantial. *See Weinschenk v. State*, 203 S.W.3d 201, 213 (Mo. 2006) ("The fact that Missouri has waived collection of costs normally charged to persons seeking a non-driver's license does not make that license 'free' if Missourians without certified copies of birth certificates or passports must still expend sums of money to obtain the license.").

It is beyond dispute that the proposed constitutional amendment does not mandate that the State cover the cost of the supporting documents that an eligible voter must provide to receive the "free" identification. Thus, when the ballot question asks the voters whether the Minnesota Constitution should be amended to "require the state to provide eligible voters with free identification," it is not stating the truth. The identification that the State must provide to those voters is not free, and the current Legislature's failure to accurately inform the voters of the true cost of the photographic identification requirement renders the ballot question unconstitutional.[33]

**33.** In *Crawford v. Marion County Election Board*, 553 U.S. 181, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008), the Supreme Court held that an Indiana law requiring voters to present photographic identification did not violate the federal Constitution. In reaching its conclusion, the Supreme Court held that the burden imposed on eligible voters who lack photographic identification did not qualify as a substantial burden on the right to vote. *Id.* at 198, 128 S.Ct. 1610. The Supreme Court's decision in *Crawford* does not alter the conclusion that the current Legislature's use of the term "free" in the ballot question is unconstitutionally misleading for several reasons. First, *Crawford* was a facial challenge to the Indiana law. Petitioners thus bore the burden of showing that the statute was unconstitutional in *all* of its applications. *Id.* at 200, 128 S.Ct. 1610. The Court acknowl-

edged the possibility that Indiana's photographic identification law may be unconstitutional when applied to certain elderly and vulnerable populations, even if the petitioners in that case could not satisfy their burden with respect to the facial challenge. *Id.* at 199, 128 S.Ct. 1610. Second, the issue before us, according to the majority, is whether the ballot question is "so unreasonable and misleading as to evade the Minnesota Constitution's requirement to submit the amendment to a popular vote." Here, the ballot question's use of the term "free" is unconstitutional not *because* of the burden it imposes on eligible voters who lack photographic identification. Rather, the use of the term "free" is unconstitutional because it *conceals the burden* that the proposed constitutional amendment imposes on the electorate, and therefore deprives the people of their right to consent to

### 4. Provisional Voting

The proposed constitutional amendment provides that "[a] voter unable to present government-issued photographic identification must be permitted to submit a provisional ballot." Ch. 167, § 1(b), 2012 Minn. Laws 145–46. The amendment further mandates that "[a] provisional ballot must only be counted if the voter certifies the provisional ballot in the manner certified by law." *Id.* 2012 Minn. Laws at 146. But, the ballot question *entirely* fails to disclose that the proposed constitutional amendment, if adopted, would result in a major change to Minnesota's elections process—the creation of a provisional voting system.

Minnesota currently maintains a system of election day registration that allows eligible voters to register to vote when they (1) appear in person at the polling place for the precinct in which the person resides on election day, (2) complete a registration application, (3) make an oath, and (4) provide proof of residence. *See* Minn. Stat. § 201.054, subd. 1 (2010); Minn.Stat. § 201.061, subd. 3 (2010). An eligible voter may prove residence by presenting either a statutorily prescribed form of identification—which includes a "current valid student identification card"—or by having another registered voter vouch, in the presence of an election judge, that the eligible voter is a resident of the voting precinct. *See* Minn.Stat. § 201.061, subd. 3(4).

The parties sharply dispute whether the proposed constitutional amendment will eliminate election day registration in Minnesota. But it should be beyond dispute that the proposed constitutional amendment requires Minnesota to adopt a provisional voting system—a system that *does not currently exist* under Minnesota

the imposition of *any* additional cost to the

law. Under a provisional voting system, a voter who does not appear on the list of eligible voters for a certain precinct may cast a provisional ballot, a *claim* that the person is entitled to vote; the provisional ballot is not reviewed until after the election. Federal law requires that states adopt and implement extensive—and often times expensive—procedures and standards to process provisional ballots. *See* 42 U.S.C. §§ 15482(a), 1973gg–2(b) (2006). As one federal appellate judge recently noted, the adoption and implementation of a provisional balloting system raises special and serious constitutional concerns:

> *Constitutional concerns regarding the review of provisional ballots by local boards of elections are especially great.* As in a recount, the review of provisional ballots occurs after the initial count of regular ballots is known. This particular post-election feature makes specific standards to ensure … equal application particularly necessary to protect the fundamental right of each voter to have his or her vote count on equal terms. The lack of specific standards for reviewing provisional ballots can otherwise result in unequal evaluation of ballots.

*Hunter v. Hamilton Cnty. Bd. of Elections,* 635 F.3d 219, 235 (6th Cir.2011) (emphasis added) (citations omitted) (internal quotation marks omitted).

The majority contends that the ballot question is not constitutionally defective because *Breza* does not require that "effects of the amendment at issue be included on the ballot," and provisional balloting is merely an "effect" of the adoption of the proposed constitutional amendment. As I indicated earlier, the majority compounds its erroneous reading of *Breza* when it states that the ballot question need not explain the "effects" of the proposed con-

exercise of that fundamental right to vote.

stitutional amendment so long as the ballot question conveys the "essential purpose." Nevertheless, the majority again misses the mark when it construes the provisional balloting as an "effect" of the proposed constitutional amendment. The amendment expressly states that "[a] voter unable to present government-issued photographic identification *must be permitted to submit a provisional ballot.*" Ch. 167, § 1(b), 2012 Minn. Laws 145–46 (emphasis added). The proposed constitutional amendment therefore, by its own terms, mandates the adoption of a provisional balloting system. Provisional balloting is not merely an "effect" of the amendment. Rather, the adoption and implementation of a provisional balloting system is a *direct consequence* of the people's adoption of the proposed constitutional amendment. The current Legislature's failure to inform the people that such a substantial change to Minnesota's election system will occur renders the ballot question unconstitutional.

## VI. OBSERVATIONS ON AUTHENTICITY AND CREDIBILITY: THE LEGISLATIVE PROCESS, ELECTORAL FRAUD, AND POLARIZED LITIGATION

There are several other aspects or factors that also have a bearing on my legal analysis of whether the current Legislature's proposed ballot question passes constitutional muster. These factors include the legislative process by which the language of that ballot question was adopted, the role of alleged electoral fraud, and the polarization that pervades this litigation. I will attempt to explain the relevance and importance of each of these factors to the validity of the ballot question.

### A. THE LEGISLATIVE PROCESS

The starting point for this part of my dissent is the legislative process that led to an inaccurate, misleading, and likely deceptive ballot question being presented to our court for review. As previously noted, both the current Legislature and the majority appear to either explicitly or implicitly acknowledge that the ballot question adopted by the Legislature is inaccurate and may even be misleading.

The record indicates that the ballot question was adopted with its authors' and its supporters' full knowledge that the question was misleading. The record reflects that the problematic aspects of the ballot question, both its inaccuracies and omissions, were repeatedly pointed out to the amendment's authors and its supporters. *See* Hearing on H.F. 2738, H. Comm. Gov't and Operations, 87th Minn. Leg., March 8, 2012 (audio tape) (comments of Rep. Kiffmeyer, House sponsor of the bill). Alternative ballot questions with more inclusive and comprehensive language were proposed and rejected.[34] The legislators who voted to pass the ballot question appear to have either ignored or feebly rebutted any and all pleas from their colleagues to improve the ballot question's language so that it is less misleading and deceptive.

---

**34.** For example, the Senate's version of the ballot question accurately tracked the language of the proposed constitutional amendment:

Shall the Minnesota Constitution be amended effective June 30, 2013, to require that all in-person voters present an approved form of government-issued photographic identification at the time of the voting; that those not voting in person provide government-issued proof of identity; that all voters be subject to substantially equivalent voter eligibility verification before a ballot is cast or counted; and that the state provide at no charge an approved photographic identification to eligible individuals?

S.F. 1577, § 2, 87th Minn. Leg.2012.

The League appears to go so far as to implicitly assert that there is evidence to support a claim that there was a malefic intent behind the adoption of the current language and rejection of any alternative, more comprehensive language.[35] The issue of intent, malefic or otherwise, is not a question that is before our court; thus, any search for the answer to this assertion must be left to the people. But the record on how the language of the ballot question came to be adopted should get our court's attention and cause us to cast a skeptical—or even a gimlet—eye on the question's specific language. There is no question that the problematic language in the ballot question is the language the Legislature intended to present to the people.

## B. ELECTION FRAUD

The current Legislature asserts that the reason the proposed constitutional amendment was adopted is the need to stop existing election fraud in Minnesota—specifically in-person voter impersonation fraud. It is beyond the scope of our court's review to question the merits of the reason for why the Legislature is submitting the proposed constitutional amendment to the people of Minnesota. But,

once the Legislature has asserted election fraud in support of or as a justification for its use of a ballot question it concedes may be inaccurate or misleading, it is appropriate for us to examine the relevance of election fraud when considering the ballot question's validity. Moreover, when, as is the situation here, the issue before us involves the people's right to vote, our examination of that reason must be careful, meticulous, and done with a skeptical eye. Without some credible showing by the current Legislature that voter impersonation fraud, in-person or otherwise, exists or at least a showing that there is some other significant election fraud in Minnesota, the authenticity and credibility of the Legislature's arguments in support of its ballot question are seriously diminished.

The assertion that Minnesota is experiencing election fraud sufficient to warrant the passage of a constitutional amendment that will result in a wholesale change to Minnesota's voting laws is an assertion that should not be made cavalierly. Those who are willing to make such an allegation should proceed with caution and must make sure that they know exactly what

---

35. To take but one example, during a floor debate, Rep. Winkler pointed out the numerous problems with the form and content and the current Legislature's ballot question to Rep. Mary Kiffmeyer, the House sponsor of H.F. 2738

REP. WINKLER: Well Representative Kiffmeyer you certainly are skilled at not answering questions. I will hand that to you.... And you have a question submitted to the voters which talks about photo ID and a free ID. But it doesn't talk about the rest of the things that are contained in your amendment like provisional balloting and the substantially equivalent language.... It seems to me that what you're doing is trying to sell your amendment to the voters, mislead them into believing that this is just about saying who you are on Election Day, when, in fact, your bill is a Trojan Horse to

do a lot of other things to disrupt and cause chaos in Minnesota's election.... This amendment including your title and the question, I believe, are a form of voter fraud because you are misleading the voters into believ[ing] that they're just voting on photo ID when they're voting on so much more.... You're trying to limit this concept of photo ID which you believe is popular as a way to usher in a whole set of changes to Minnesota's election law which I think will create chaos and confusion and will disrupt some very popular aspects of our voting, including absentee balloting and same day registration, so I think you're committing voter fraud.

H. Debate on H.F. 2738, 87th Minn. Leg., April 3, 2012 (audio tape) (statement of Rep. Winkler).

they are talking about when they use the term "election fraud."

The concept of election fraud is nothing new to constitutional democracies. The history of election fraud has been well documented.[36] It exists because, in a constitutional democracy, all sovereign power resides with the people and the people transfer some of their sovereign power to those persons they choose, through the election process, to represent them. Elections and the transfer of sovereign power are an essential ingredient of a constitutional democracy, to the establishment and preservation of a civil society, and to the implementation and preservation of the rule of law. Unfortunately, when power is at stake, fraud will most likely be its constant companion. There will always be certain people who are willing to undermine the electoral process in order to seek some special advantage in a quest for pow-er. These people are the ones who make fraud a fellow traveler in the electoral process.

Democratic societies routinely strive to eliminate or minimize fraud in the electoral process. Minnesota has a reputation for doing a good job to minimize or eliminate electoral fraud and has earned, as Governor Dayton noted, a "Best–in–the–Nation"[37] reputation for how it conducts elections.[38] This reputation has been tested and scrutinized during two recent statewide recounts—the 2008 U.S. Senate election and the 2010 Governor's election. *See, e.g., In re Contest of Gen. Election held on November 4, 2008*, 767 N.W.2d 453 (Minn.2009). Importantly, our court's extensive examination of Minnesota's elections in both of those cases revealed no evidence of election fraud. *See id.* at 457 ("No claim of fraud in the election or during the recount was made by either par-

**36.** As previously noted, the election for Minnesota's Constitutional Assembly was surrounded with many allegations of fraud.

**37.** *See* Letter From Mark Dayton, Governor of Minnesota, to Kurt Zellers, Speaker of the House, Minnesota House of Representatives (Apr. 9, 2012) (vetoing H.F. 2738 and urging Minnesotans to reject the proposed constitutional amendment).

**38.** I would expand upon the Governor's statement by adding that Minnesota's reputation is not just national, it is international. I have had the privilege of representing the United States internationally as part of our country's effort to promote open, fair, and honest elections in foreign countries. I have lectured and been a presenter at several symposiums and meetings on issues involving election law and regulations; enfranchisement of voters; voting procedures; the use of electronic voting machines; election fraud; and post-election litigation.

I have done this international work under the auspices of the United States Department of State, USAID, the International Foundation for Electoral Systems (IFES), and the American Bar Association Rule of Law Initia-tive. I was in the Philippines (2010), Libya (2012), and Tunisia (2012); I have also spoken on this topic in China and Russia. In October 2010, at the invitation of IFES I addressed an international group of government election officials, legislators, and Members of Parliament on these same topics.

As tempting as it may be to think that there may be something special about me that led me to be invited to make these presentations, that is not the case. It was not about me, it was about where I am from—the State of Minnesota. The people I met with wanted to know about election procedures and practices in Minnesota because Minnesota has an excellent reputation for conducting open, fair, and honest elections. One example of the respect Minnesota election procedures engender occurred at the 2010 Washington, D.C. IFES conference. Several delegates approached me and told me that they wanted to know more about how Minnesota conducts its elections, because as the delegate from Ukraine said, they wanted to "be like Minnesota." The Governor was correct when he stated that Minnesota has an excellent national reputation for how we conduct our elections, but he did not go far enough—Minnesota's excellent reputation is international in scope. *Id.*

ty"). When allegations surface that there is serious election fraud in our state, Minnesotans, including the judiciary, sit up and take notice.

Election fraud is a term that is easy to use, but its meaning is imprecise and it is often used subjectively, particularly when used as part of an effort to achieve a particular purpose. Admittedly, there is a lack of consensus over what is meant by the terms election or electoral fraud. *See generally* Chad Vickery & Erica Shein, Int'l Found. for Electoral Sys., *Assessing Electoral Fraud in New Democracies: Refining the Vocabulary* (2012). But, there are some definitions which allow us to hone in on a precise meaning. "Illegal conduct committed in an election, usually in the form of fraudulent voting. Examples include voting twice, voting under another person's name (usually a deceased person) or voting while ineligible." *Black's Law Dictionary* 536 (7th ed.1999). In 2010, the International Foundation of Election Systems defined electoral fraud as "Deceptive or negligent interference with the electoral process that intends to prevent the outcome from reflecting the will of the people." Rafael López–Pintor, Int'l Found. for Electoral Sys., *Assessing Electoral Fraud in New Democracies: A Basic Conceptual Framework* 9 (2010). In their May 2012 white paper, Vickery and Shein provide some alternative approaches to and definitions of electoral fraud. *See* Vickery & Shein, *supra*, at 9–11. A precise, generally agreed upon definition of election fraud is hard to find; the term means different things to different people.

Election fraud has several fellow travelers that affect election results but do not constitute fraud. There are at least four other general categories of practice that undermine the electoral process that come to mind: (1) malpractice; (2) systematic manipulation; (3) negligence; and, (4) incompetence. In the electoral process, incompetence and negligence occur with some regularity, and when they occur they can prevent the outcome of an election from reflecting the will of the people. One need look no further than the 2000 presidential election in Florida for a prime example for how either incompetence or negligence—or both—can dramatically change the outcome of an election. But what occurred in Florida with respect to butterfly ballots should not be categorized as election fraud.

Incompetence and negligence—two of fraud's fellow travelers—are not criminal. Manipulation can be fraudulent, but most often it is not. Malpractice can and frequently does constitute fraudulent acts. Herein lies the problem I have with the current Legislature's arguments—the imprecise use and application of the term election fraud when referring to practices that can affect or even distort the result of an election.

The Legislature appears to rely upon alleged election fraud as the purpose behind the proposed constitutional amendment and the ballot question. But, to support its allegations, the Legislature cites practices that have no relation to voter impersonation fraud—the type of electoral fraud that the proposed amendment is specifically designed to remedy. There may well be election practices occurring in Minnesota that undermine the electoral process. Wherever these practices fall on the spectrum of electoral fraud, there is no question that efforts should be made to eliminate those practices so that election results can be a valid reflection of the will of the people. But efforts to eliminate these practices will depend upon a greater degree of sophistication and understanding of the concept of election fraud than the parties have demonstrated here.

The record before us is woefully deficient in that it fails to provide our court with even the most basic information about what fraud is to be eliminated in Minnesota. We have a right to expect a much better demonstration of what, if any, or how much electoral fraud is being manifested in our state. Tellingly, the current Legislature was unable to cite to any specific instance of in-person voter impersonation fraud. That is not to say that some parts of the Legislature's assertion of election fraud cannot be shown to exist, especially given the fact that elections are a fallible human institution. Mistakes, even fraud may well occur, but a credible showing of existing election fraud has not been made here. What can be said with some certainty is that the record and arguments fall short of meeting the necessary burden we require to prove the Legislature's allegations of electoral fraud. This shortcoming seriously undermines the authenticity and credibility of the Legislature's arguments.

Even without the inferences one normally draws when undisclosed agendas are at work, a list of the remaining reasons or explanations for adopting the proposed amendment are not particularly charitable to the Legislature. The explanations even become a double-edged sword when, as previously noted, we consider that efforts to suppress the vote by certain classes of voters is on the list of explanations provided by the League. The allegation of election fraud then becomes a double-edged sword for the Legislature because a significant type of election fraud that is universally recognized around the world is a clandestine effort to shape election results by "distort[ing] the citizenry's preferences by denying voting rights to some citizens, while amplifying the voice of others." Andreas Schedler, *The Menu of Manipulation*, 13 J. Democracy 36, 44–45 (2002).

## C. Polarized Litigation

How this case was litigated is also cause for concern. Early on it became evident that the positions taken by the parties on the validity of the proposed ballot question, vis-à-vis the constitutional amendment, were at polar opposites, both legally and politically. This polarization was evident in the parties' briefs and at oral argument.

It is unfortunate that our court has been drawn into the current national and state conflict between political forces over how citizens can exercise their right to vote. Nevertheless, we are at the epicenter of this conflict's highly polarized and partisan atmosphere as it plays out in Minnesota; thus we have no choice but to render a decision. That said, the parties should have been more cognizant of the distaste that courts generally, and our court, in particular, have for bringing a polarized, partisan atmosphere with them when they come to our courtrooms. It would have been more helpful had the parties demonstrated more objectivity in their arguments, and been more willing to acknowledge the law, both pro and con, when presenting their arguments to our court.

### 1. The League's Remedy—A Bridge Too Far

The League overreached when it took an inflexible approach to the remedy it sought from our court. The League's failure to recognize or its unwillingness to acknowledge the current Legislature's power under Article IX to propose constitutional amendments was both frustrating to observe and in many ways was counterproductive to achieving any impact with the League's arguments. The League appeared to be so focused on using a defective ballot question as a lever to pry the Legislature's proposed constitutional

amendment off the November ballot that it ignored the plain text of Article IX.

Unquestionably, the League presented a compelling argument that the current Legislature's ballot question was defective, but in Minnesota a constitutionally defective ballot question in and of itself is not enough to remove a validly proposed constitutional amendment from the general election ballot. The League did not recognize or acknowledge the language in Article IX through which the people gave the Legislature the power to propose constitutional amendments by placing them on the general election ballot. By a majority vote the Legislature proposed a constitutional amendment to Minnesota's Constitution. It would be an act of judicial activism for our court to void this valid act, especially when there is an alternative mandated by the plain text of the Constitution—the placement of the full text of the proposed amendment on the ballot.

The case before us is about a process, how the people give their consent to a proposed constitutional amendment. It is not about rejecting in total the current Legislature's validly proposed constitutional amendment. The League's failure to recognize the overreaching nature of its proposed remedy makes the idiom *a bridge too far* apt. *A bridge too far* refers to an act of overreaching—going too far and getting into trouble or failing because of that act.[39]

This flaw in the League's approach sufficiently undermined its arguments that it has failed to obtain any relief—not even the viable alternative of having the defective ballot question stricken and the full

text of the proposed constitutional amendment put on the ballot in its place. The League's flawed tactic also left it open to justifiable criticism by the majority that it "seeks unprecedented relief" and also gave the majority an opening to ignore the plain text of the Constitution by stating that the issue of placing the full text of the proposed constitutional amendment is not before us because the League did not raise this issue.

2. The Current Legislature's Position—Rigid and Reticent

The current Legislature's arguments in many ways proved to be even less helpful than those of the League. The Legislature rigidly adhered to the position that exclusive authority over all aspects of the ballot question reside with the Legislature, that our court lacks any power to review the ballot question, and that the Legislature can design any ballot question it wants to place on the ballot. The Legislature refused to provide the necessary context for the proposed ballot question by repeatedly not responding to questions about the purpose and effect of the proposed constitutional amendment. It also repeatedly failed to answer several questions about whether the Legislature could draft a deceptive ballot question (*see* footnote 30). The Legislature was also unwilling to identify the source of its claimed broad powers with respect to how a proposed constitutional amendment is submitted to the people. Indeed, under the Legislature's view of the case as articulated to our court, the Legislature's claimed broad

---

**39.** *A bridge too far* is derived from the Market Garden offensive during World War II. Much like the Allies' September 1944 offensive in the Netherlands, the League started well with its on-target analysis of the defective ballot question. But then, much like the Allies, it overextended itself when it inflexibly asserted

that the only remedy for a defective ballot question is removal of the proposed amendment from the ballot. This flaw in the League's approach leaves the League pretty much in the same position in which the Allies found themselves at the end of Market Garden—back where it started.

powers are superior to the people's power to "alter, modify or reform government."

The polarization, rigidity, and reticence of the current Legislature's presentation of its case not only diminished the merit and helpfulness of its arguments, but it also created a cause for concern. The Legislature's reticence when faced with relevant questions raised the issue of whether its response to this litigation may be driven by an undisclosed or unspecified agenda. Again, when such concerns arise they have a bearing on the authenticity and credibility of a party's arguments. Courts become wary when it appears a party's position is being driven by an undisclosed agenda or if it appears as though the parties are hiding the ball. *See Armstrong v. Harris,* 773 So.2d 7, 18 (Fla.2000) (The court, in discussing such an effort, stated "In evaluating an amendment's chief purpose, a court must look not to subjective criteria espoused by the amendment's sponsor but to objective criteria inherent in the amendment itself, such as the amendment's main effect.... [Here, t]he main effect of the amendment is not stated anywhere on the ballot. (The voter is not even told on the ballot that the word 'or' ... will be changed to 'and'—a significant change by itself.)" (footnotes omitted)).

In his separate dissent, Justice Page states that the current Legislature's proposed constitutional amendment together with the ballot question involve a "bait and switch." Justice Page's analytical approach that led him to conclude there is a "bait and switch" involves an approach similar to what I used when I was engaged in the private practice of law: I always sought to take a common-sense and reasonable approach to any matter entrusted to my care. When deciding how to proceed with a matter, I would apply what I referred to as a common-sense or propriety test to determine the legitimacy of the

matter—was it authentic, credible, or ethical. A matter had to pass this legitimacy test; otherwise I would consider it to be non-meritorious. I have applied a similar common-sense or propriety approach to the issues that come before me as a judge. When my common-sense test is applied here, many aspects of the Legislature's case come up short with respect to authenticity and credibility.

To say that aspects of the current Legislature's case fail a common-sense test for legitimacy is an indictment that requires further explanation. In a case as important as this one, where the constitutionality of a ballot question is disputed, it should be obvious that our court should inquire what is really at stake. The purpose and effect of the proposed constitutional amendment is relevant so that we can properly analyze the constitutionality of the ballot question. The parties not only appear to acknowledge the validity of such an inquiry, but at times appeared to invite us to make the inquiry. Nevertheless, there has been a failure and unwillingness by the Legislature to respond to or candidly answer questions about the proposed constitutional amendment—a failure that ultimately became pervasive in these proceedings.

Assuming that the putative purpose for the proposed constitutional amendment is to eliminate election fraud in the form of voter impersonation it becomes highly relevant that the ballot question's defenders could not identify any specific incident of past voter impersonation fraud that the proposed amendment would eliminate. When confronted with diligent questioning on this point, there was an apparent effort to seek refuge by claiming that the amendment will be prophylactic—its main affect will be to eliminate any potential for future election fraud. When the Legislature's responses are juxtaposed with the League's

claims that the proposed constitutional amendment will disenfranchise several classes of Minnesota voters—namely the elderly, the young, persons of color, persons who are transient, rural voters, the disabled, and the poor—genuine questions about authenticity and credibility arise. In the end, when the Legislature's arguments and its responses or even lack of responses to relevant questions are "carefully and meticulously scrutinized" or given a "close and exacting examination," they ultimately raise many more questions than they answer.

## VII. RESOLVING THE BALLOT QUESTION

Having concluded that the constitution requires the full text of any proposed constitutional amendment must be submitted to the people, the second question to be answered is the validity of the ballot question. Once again, if we use the Minnesota Constitution as our template, the answer is not difficult. The issue is easily resolved by asking and answering a series of questions. The questions and answers are as follows.

• Does our court have the power to review a proposed ballot question to determine whether the ballot question is constitutional? The answer is yes.

• Does the Minnesota Constitution allow the current Legislature to place an inaccurate, misleading, and possibly deceptive ballot question on the ballot? The answer is no.

• Is the ballot question designed by the current Legislature inaccurate, misleading, and/or deceptive? I have al-

ready answered that question "yes." Moreover, I started this dissent stating that the ballot question was "inaccurate, misleading, and *possibly* deceptive." I then changed the "possibly deceptive" to *likely* deceptive. Having worked my way through all of the analytical steps of this dissent, I conclude that the ballot question is not only inaccurate and misleading, it is without doubt, *deceptive.*

• Can the current Legislature place the inaccurate, misleading, and deceptive ballot question it has designed on the ballot? The answer is a definite no.

## VIII. THE MAJORITY OPINION

The place to end this dissent is with a few final comments regarding the majority's holding. As previously stated, I conclude the result reached by the majority thwarts the will of the people as expressed in Minnesota's Constitution, and deprives the people of the opportunity to speak and to be heard with a knowing and meaningful voice when they decide whether to adopt the proposed constitutional amendment.

Unquestionably, the proposed constitutional amendment will "alter, modify or reform government" in Minnesota as we know it today. It may even result in a major change, a sea-change in how Minnesotans vote. Nevertheless, the current Legislature asserts that it has the exclusive power to design the form and content of a ballot question and then present that ballot question to the people even if the question is defective or deceptive.[40] More-

---

**40.** Neither the current Legislature nor the majority identify the source of this claimed power. Nowhere does the Minnesota Constitution expressly confer upon the Legislature the power to create, form, and design a ballot question and then place this ballot question on the general election ballot instead of the full text of the proposed constitutional amendment. In the absence of such a grant, it appears that the Legislature and the majority are making an argument that this power is inherent in the language of Article IX. But, I cannot find it there.

over, the Legislature asserts that "good enough" or "close enough"—as only the Legislature has the power to define those terms—suffice when asking the people to consent to the adoption of a constitutional amendment. The majority apparently adopts this abstract "close enough" standard. While acknowledging our court's constitutional right of review, the majority nevertheless grants so much deference to the Legislature that the current Legislature is granted power well beyond that provided for in the Constitution. Such a result offends the doctrine of separation of powers and creates a dangerous precedent.

Close enough should not suffice when it comes to amending Minnesota's Constitution; that standard should be rejected. This is especially true when the current Legislature's definition of close enough is so broad that it includes an inaccurate, misleading, and deceptive ballot question. Even in horseshoes, a game in which close enough may count, the rules provide that the horseshoe must land within a certain distance of the stake for the throw to count. Here, the ballot question designed by the Legislature and being thrown at Minnesota voters on election day lands so far from the stake—the meaning and pur-pose of the proposed amendment—that it should not be allowed anywhere near the November 6, 2012 general election ballot.

Finally, the result reached by the majority—putting a knowingly inaccurate, misleading, and deceptive question on the ballot—has a disconcertingly surreal aspect to it. Justice Page recognizes this aspect of the majority's opinion when he calls the result nonsense. I would put it a bit differently. To me it seems as though Alice of Alice in Wonderland has taken us by the hand, led us through the looking glass and together we have tumbled down the rabbit hole, landing in a realm where up is down and black is white.[41] A land where the doctrine of judicial review is turned on its head, ordinary law trumps basic and fundamental constitutional law, deference becomes abdication of duty, and the definition of close enough is so broad it encompasses inaccurate, misleading, and deceptive.

## IX. CONCLUSION

The case before our court today is among the most vexatious cases I have been involved with during my 18–year tenure as a justice. Without question this case raises several of the most interesting

There are many obvious and inherent problems with an *inherent* powers argument. First, as an entity created by the people, the Legislature must yield any inherent power to the people unless there is an express grant of power. Second, the people made no such express grant of power to the Legislature. Third, there is no indication that this power is implied as being necessary for the Legislature to propose amendments to the Constitution. In fact, the exact opposite is more likely—the full text of the proposed amendment is unquestionably the best source of primary information for the voters. Courts are reluctant to recognize inherent power where there is no express grant of the power. *See Country Joe v. City of Eagan*, 560 N.W.2d 681, 683 (Minn. 1997) (stating that "[a]s a limited statutory creation, the city has no inherent powers be-yond those 'expressly conferred by statute or implied as necessary in aid of those powers which have been expressly conferred.'" (quoting *Mangold Midwest Co. v. Village of Richfield*, 274 Minn. 347, 357, 143 N.W.2d 813, 820 (1966))). *See also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (stating that "the president's power, if any, . . . must stem either from an act of Congress or from the Constitution itself"). Finally, and most compelling, is the fact that Article I, section 1 of the Minnesota Constitution expressly states that "all political power is inherent" in the people.

41. Lewis Carroll, *Alice's Adventures in Wonderland and Through the Looking Glass* (Knopf 1992) (1865).

and important issues a high appellate court in a constitutional democracy must review. But the underlying facts, the actions of the current Legislature, the nature of the litigation, and most importantly the majority's holding create a disconcerting set of circumstances that should raise serious concerns about how Minnesotans will be permitted to exercise their fundamental right to vote and how our court addresses these important issues. There are many reasons why Minnesotans need to take very seriously not only the how, why, wherefore, and result of this litigation, but they need to be concerned about what will happen next.

Over 200 years ago, Thomas Jefferson articulated his view on a fundamental underlying principle of our constitutional democracy—all inherent power resides in the people and it is the people who must decide the basic and fundamental law that is embodied in their constitution. Ultimate power in our society is with the people. Jefferson explained how this principle works when he said:

> I know no safe depository of the ultimate powers of the society but the people themselves; and if we think them not enlightened enough to exercise their control with a wholesome discretion, the remedy is not to take it from them, but to inform their discretion by education.

Our constitutional democracy has thrived for over 200 years within the framework of this principle—sovereignty and all political power reside with the people. There is no other place it can reside. Some people lack confidence in the people's ability to "exercise their control with a wholesome discretion" and they count among their ranks the many cynics who readily and vociferously articulate their disbelief in this principle. These cynics lack confidence that the people will properly "exercise their control." Some of the more cynical even seek to wrest control of the political process from the people. They are so misguided. Our two constitutions do not allow for the taking of control—the fundamental right to vote—away from the people.

For me it is profoundly disappointing that the current Legislature, with the consent of our court, will not follow the Minnesota Constitution and will avoid the people's mandate to put the full text of the proposed constitutional amendment on the general election ballot this November. It is equally disappointing that an unconstitutional ballot question—an inaccurate, misleading, and deceptive ballot question—will instead be on the ballot.

So what will happen next? What remains is for the people of Minnesota to follow Jefferson's wise instructions. Minnesotans need to educate themselves and educate each other about the purpose of the proposed constitutional amendment, its impact on them, and then decide what is the right thing to do. They must "exercise their control" by reading the full text of the proposed amendment before they enter the voting booth. If the voters of Minnesota take the necessary steps to independently educate themselves and each other, then, and only then, can they cast an educated, informed, and intelligent vote on whether to approve or reject the proposed constitutional amendment that will have been improperly submitted to them.